LILI V. GRAHAM SBN 284264
lgraham@legal-aid.com
SARAH J. GREGORY SBN 303973
sgregory@legal-aid.com
MICHELLE KIM KOTVAL SBN 293830
mkotval@legal-aid.com
CRYSTAL SIMS SBN 62796
csims@legal-aid.com
LEGAL AID SOCIETY OF ORANGE COUNTY
2101 North Tustin Avenue
Santa Ana, California 92705
Telephone: 714.571.5282
Facsimile: 714.571.5270

ATTORNEYS FOR PLAINTIFFS

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA – SOUTHERN DIVISION

| | |
|---|---|
| DAVID RAMIREZ, SHARON SWEAT, STEPHENIE SAINT VINCENT, RAYA IVES, DEREK MACARTHUR, KIM GRAY, and ERIK TEASLEY, as individuals; PEOPLE'S HOMELESS TASK FORCE, an unincorporated association;<br><br>    Plaintiffs,<br><br>  vs.<br><br>THE COUNTY OF ORANGE, a municipal entity;<br><br>    Defendant. | Case No.  8:18-cv-00220-DOC-KES<br><br>Related Case No. 8:18-cv-00155-DOC-KES<br><br>**PLAINTIFFS' RESPONSE TO COURT'S MARCH 14, 2018 ORDER IN *CATHOLIC WORKER*, *EX PARTE* APPLICATION FOR TEMPORARY RESTRAINING ORDER  AND OSC RE FOR PRELIMINARY INJUNCTION**<br><br>[Memorandum of Point and Authorities in Support of Motion; Declarations of Ramirez, Ives, MacArthur, Ingram, Kotval, and Robbins; and [Proposed] Order filed concurrently herewith]<br><br>Date:  TBD<br>Time:  TBD<br>Ctrm:  TBD |

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# TABLE OF CONTENTS

Page

**I.**   INTRODUCTION ...................................................................1

**II.**   STATEMENT OF FACTS ........................................................3

    A.   Plaintiffs Are Vulnerable Homeless Individuals With
Disabilities Who Had Built A Relatively Safe And Familiar
Home At The Riverbed. .................................................3

    B.   The County Announces Plans To Evict The Homeless From
The Riverbed Even Though It Was in the Midst of
Implementing a Long-Term Plan for Relocating the Homeless
Population to Appropriate Housing. .................................4

    C.   The County Again Promises To Provide Appropriate Long-
Term Solutions, But Plaintiffs Are Displaced From The
Riverbed To Motels Where Their Disability Conditions
Worsen. ...................................................................5

    D.   The County Has Not Provided Adequate Accommodation For
Plaintiffs' Physical Disabilities, and Plaintiffs Will Be Forced
Back On The Streets In A Condition That Is Worse Than
Before. ....................................................................8

**III.**   ARGUMENT ........................................................................8

    A.   Absent A TRO, Plaintiffs Will Suffer Serious Irreparable
Harm. ......................................................................9

    B.   The Balance Of Hardships Tips Sharply In Plaintiffs' Favor .....11

    C.   A TRO Is In The Public Interest. ....................................12

    D.   Plaintiffs Will Likely Succeed On The Merits Of Their
Claims. ....................................................................13

        1.   Defendant Has Discriminated Against Plaintiffs On
The Basis Of Their Disability In Violation Of The
ADA And Rehabilitation Act. ....................................13

2. The Program Violates Substantive Due Process. ..............18

E. A Bond Is Not Required...........................................................20

**IV.** CONCLUSION ......................................................................21

# **TABLE OF AUTHORITIES**

**Page(s)**

## **CASES**

*Alliance for the Wild Rockies v. Cottrell*,
   632 F.3d 1127 (9th Cir. 2011) ................................................................14

*Arizona Dream Act Coal. v. Brewer*,
   757 F.3d 1053 (9th Cir. 2014) ..............................................................15

*Carrillo v. Schneider Logistics, Inc.*,
   823 F. Supp. 2d 1040 (C.D. Cal. 2011) ................................................14

*Chalk v. U.S. Dist. Court Cent. Dist. Of California*,
   840 F.2d 701 (9th Cir. 1988) ................................................................16

*Cohen v. City of Culver City*,
   754 F.3d 690 (9th Cir. 2014) ................................................................20

*Communities Actively Living Independent and Free v. City of Los
   Angeles*,
   No. CV 09-0287 2011 WL 4595993 (C.D. Cal. 2011) ........................20

*Crowder v. Kitagawa*,
   81 F. 3d 1480 (9th Cir. 1996) ..............................................................19

*Duvall v. County of Kitsap*,
   260 F. 3d 1124 (9th Cir. 2001) ............................................................20

*Enyart v. Nat'l Conference of Bar Exam'rs, Inc.*,
   630 F.3d 1153 (9th Cir. 2011) ..............................................................18

*Flynt Distrib. Co., Inc. v. Harvey*,
   734 F.2d 1389 (9th Cir. 1984) ..............................................................14

*Fortyune v. City of Lomita*,
   766 F.3d 1098 (9th Cir. 2014) ..............................................................19

*Johnson v. Couturier*,
   572 F.3d 1067 (9th Cir. 2009) ..............................................................14

*Kennedy v. City of Ridgefield*,
 439 F.3d 1055 (9th Cir. 2006) ....................................................................23, 25

*L.W. v. Grubbs*,
 92 F.3d 894 (9th Cir. 1996) ...............................................................................24

*McGary v. City of Portland*,
 386 F.3d 1259 (9th Cir. 2004) ...........................................................................19

*Melendres v. Arpaio*,
 695 F.3d 990 (9th Cir. 2012) .............................................................................18

*Michell v. City of Los Angeles*,
 16-CV-01750 ......................................................................................................16

*Miller v. Carlson*,
 768 F. Supp. 1331 (N.D. Cal. 1991)...................................................................26

*Munger v. City of Glasgow*,
 227 F.3d 1082 (9th Cir. 2000) ...........................................................................25

*Orange County Catholic Worker v. Orange County*,
 18-cv-00155 ..........................................................................................................7

*Sanchez v. City of Fresno*,
 No. 1:12–CV–00428, 2014 WL 2042058 (E.D. Cal. 2014).........................24, 25

*Small v. Avanti Health Sys., LLC*,
 661 F.3d 1180 (9th Cir. 2011) ...........................................................................15

*California ex rel. Van De Kamp v. Tahoe Regional Planning Agency*,
 766 F.2d 1319 (9th Cir. 1985), *modified*, 775 F.2d 998....................................26

*Weinreich v. Los Angeles County Metro. Transp. Auth.*,
 114 F.3d 976 (9th Cir. 1997) .............................................................................18

*Winter v. Nat'l Res. Def. Council, Inc.*,
 555 U.S. 7 (2008)................................................................................................14

*Wood v. County of Alameda*,
 No. C 94 1557, 1995 WL 705139 (N.D. Cal. 1995) ..........................................16

*Wood v. Ostrander,*
    879 F. 2d 583 (9th Cir. 1989) ............................................................23

## STATUTES

29 U.S.C. § 794 ...................................................................................19

42 U.S.C. § 12102(1) .........................................................................19

42 U.S.C. § 12102(2)(A) .....................................................................19

## REGULATIONS

28 C.F.R. § 35.130(b) (7) ....................................................................20

29 CFR § 1630.2(j)(3)(iii) ...................................................................19

## OTHER AUTHORITIES

D. Snow, R. Goldberg, *Homelessness in Orange County: The Costs to
    Our Community* (2017) .......................................................................23

Orange, County Executive Office, *An Assessment of Homeless Services in
    Orange County* (Oct. 18, 2016) .........................................................23

*Voice of Orange County* (March 8, 2018) county-government-has-at-least-
    230-million-it-could-use-to-address-homelessness .............................23

## I.    INTRODUCTION

As of January 2018, Plaintiffs, seven disabled homeless individuals, were residing at the Santa Ana Riverbed (the "Riverbed") with their tents, blankets, and other personal belongings.  There, they were able to have a certain degree of privacy, protection, and comfort in a community that they called their home.  On January 22, 2018, the County of Orange (the "County" or "Defendant") began to evict Plaintiffs and other homeless individuals from the Riverbed even though the County was in the midst of implementing a state and federally funded program to relocate them to appropriate housing (the "Program").

On February 14, 2018, the parties in *Orange County Catholic Worker v. Orange County* ("*Catholic Worker*"), 18-cv-00155 DOC (KESx), executed a stipulation modifying the Program to provide that the County would relocate homeless individuals, including Plaintiffs, from the Riverbed to motel rooms for a *minimum* of 30 days while the County completed clinical assessments to determine each person's housing needs and appropriate resources to accommodate those needs (the "Stipulation").  *Catholic Worker*, ECF No. 92.  However, the County proceeded to move Plaintiffs and others to motels that were far from their familiar surroundings and failed to provide adequate access to food, transportation, and services.  At least one Plaintiff was evicted during his motel stay and had to sleep on the sidewalk in temperatures dropping to the mid-40s without any tent, blanket, or protection from the

cold.  Other Plaintiffs were not provided with any guidance or explanation as to the services that were available to them or did not receive necessary food vouchers or transportation passes.

At least three Plaintiffs have now received notices that they will be evicted from the motels on Saturday, March 17 and Monday, March 19.  Additional Plaintiffs and other disabled homeless individuals will be displaced next week.  Plaintiffs have undergone clinical assessments by an independent practitioner, Dr. Brenda Ingram, who has concluded that people with trauma-based mental health conditions, including Plaintiffs, will experience adverse health consequences if they are relocated to temporary shelters.  *See* Ingram Decl.  ¶¶ 10-36.

Without access to their motel rooms, Plaintiffs and others will be forced back on the streets—only this time they will be worse off and in far more danger than when they were on the Riverbed because they face sleeping outside in the rain and cold weather without their tents, blankets, and necessary survival items, which they were required to leave on the Riverbed when they were displaced by the County.  Plaintiffs in *Catholic Worker* expressed similar concerns (s*ee Catholic Worker*, ECF Nos. 119, 121).

The Court has issued a minute order setting a hearing on Saturday, March 17 and has invited briefing by interested parties.  *Id.*, ECF No. 120.  In response to the Court's order and in light of the imminent and irreparable harm Plaintiffs face,

Plaintiffs respectfully request that the Court issue a temporary restraining order requiring the County to maintain the status quo and keep Plaintiffs in disability appropriate housing, such as their current motel placements, until the County provides appropriate resources and housing that it committed to providing under the Program. Plaintiffs also request that the Court issue a temporary restraining order requiring the County to maintain the status quo and keep individuals that reported a disability to the County during clinical assessments, or who the County otherwise has reason to believe has a disability, in disability appropriate housing, such as their current motel placements, until the County provides the appropriate resources and housing that it committed to providing under the Program. Plaintiffs also request that the Court set an order to show cause why a preliminary injunction should not issue.

## II. STATEMENT OF FACTS

### A. Plaintiffs Are Vulnerable Homeless Individuals With Disabilities Who Had Built A Relatively Safe And Familiar Home At The Riverbed.

Plaintiffs are seven homeless individuals with various disabilities and the People's Homeless Task Force ("PHTF"), a grassroots association formed to assist and advocate on behalf of homeless residents of Orange County. Robbins Decl. ¶¶ 2-3. Plaintiffs suffer from a diverse range of mental health disabilities, including anxiety, depression, delusions, traumatic flashbacks, and schizophrenia. Ingram Decl. ¶¶ 18-19, 24, 26. Prior to the County's actions, as detailed below, Plaintiffs had lived at the Riverbed for significant periods of time, ranging from a few months to fourteen years,

and considered the Riverbed their home.  Kotval Decl., Exs. 4-10; Ramirez Decl. ¶ 12; MacArthur Decl. ¶ 10; Ives Decl. ¶ 2.  Although not ideal, for many Plaintiffs, the Riverbed was the only constant in their chaotic lives, providing a source of familiar community, environmental stability, and protection in the form of tents and blankets. Ramirez Decl. ¶ 11; MacArthur Decl. ¶ 11; Ives Decl. ¶ 6.

**B. The County Announces Plans To Evict The Homeless From The Riverbed Even Though It Was in the Midst of Implementing a Long-Term Plan for Relocating the Homeless Population to Appropriate Housing.**

On June 6, 2017, the Orange County Board of Supervisors approved $750,000 to enter into a contract with City Net, a nonprofit service provider, to facilitate enhanced provision of services and housing to Riverbed residents.  Request for Judicial Notice ("RJN") at ¶ 3.  On June 28, 2017, the Orange County Board of Supervisors approved funding to expand the County's Whole Person Care (WPC) services to include additional recuperative care for the County's homeless population.  RJN at ¶ 5.

On July 1, 2017, the County announced a "Building a System of Care" initiative that included "increased investments in outreach, services, and affordable housing developments."  RJN at ¶ 3.  This System of Care initiative included an award of $22 million to renew critical resources under various housing initiatives, including homeless housing such as permanent supportive housing, an award of $31.1 million to participate in the Whole Person Care Initiative for services to people experiencing homelessness and mental illness, and funding to build out the capacity of existing

shelters, all of which were part of the County's Program to assist homeless residents. RJN at ¶ 4.

Although the County was in the midst of implementing the Program and had not yet made contact with hundreds of Riverbed residents, on January 3, 2018, the County announced plans to abruptly evict all homeless individuals from the Riverbed. Kotval Decl., Ex. 2. On January 8, 2018, the County posted Work Notices along the Riverbed, giving residents two weeks to vacate. Ramirez Decl. ¶ 15; MacArthur Decl. ¶ 14. The Work Notices stated that individuals who remain on or return to the Riverbed after January 22, 2018 would be prosecuted under California law. *Id.*

### C. The County Again Promises To Provide Appropriate Long-Term Solutions, But Plaintiffs Are Displaced From The Riverbed To Motels Where Their Disability Conditions Worsen.

On February 13, 2018, the County stated that it would relocate the homeless living at the Riverbed to motels or shelters for a "minimum" of 30 days while the County continued to implement its Program. *Catholic Worker*, ECF No. 92. The Stipulation required the County to provide services, including food, health, and transportation services, and to store the personal property of homeless individuals for 90 days. *Id.* at ¶¶ 3-5. The County also agreed to complete clinical assessments of each person's needs and appropriate resources. *Id.* at ¶ 2. At the conclusion of the 30 days, the County promised to provide "appropriate resources." *Id.* at ¶ 8.

On or about February 14, 2018, the County began relocating the homeless population living at the Riverbed.  Over the next ten days, the County relocated Plaintiffs to various motels throughout Orange County without giving Plaintiffs any time to pack up essential living items that they relied on to survive, including blankets, clothes, and tents.  Kotval Decl., Ex. 13; Ramirez Decl. ¶ 18; MacArthur Decl. ¶¶ 14, 15; Ives Decl. ¶10; *see also* ECF No. 23, 25.  To date, Plaintiffs have not been able to retrieve their personal belongings.  The County assured Plaintiffs that they would be reintegrated into society and would have access to the County's services and housing options if they accepted the motel vouchers.  Ramirez Decl. ¶ 18; MacArthur Decl. ¶ 21; Ives Decl. ¶ 8-9.

Since relocating to their respective motel rooms, Plaintiffs have been re-traumatized and their mental health symptoms have been exacerbated by the County's assessment process and its treatment of homeless individuals.  Ingram Decl. ¶¶ 20, 28, 32, 36.  <u>First</u>, although the Stipulation required the County to provide food resources to relocated individuals, the County did not provide food to Plaintiffs on a consistent basis.  Robbins Decl. ¶¶ 8-9.  Plaintiffs, in fact, did not initially receive food vouchers for over a week and lived in rooms in which the microwaves or refrigerators had been removed.  Ives Decl. ¶ 9; MacArthur Decl. ¶ 16.  This was the case even though Plaintiffs' counsel informed the County that Plaintiffs had not received food vouchers and were in desperate need of food.  Kotval Decl., Ex. 14.

Second, although the County committed to providing transportation to medical, social service, or housing appointments, Plaintiff Sweat missed a medical appointment because the County did not provide a bus pass in a timely manner.  Kotval Decl., Ex. 1.  Third, Plaintiffs were in need of critical services but did not have a way of communicating these needs to the County.  Indeed, some of the motels, including the Baymont Inn, stripped the motel rooms of telephones, leaving Plaintiffs isolated and without means of communicating or requesting services from the County.  Kotval Decl., Ex. 1.

Fourth, Plaintiff Ramirez was moved to three different motels during the 30-day period and was evicted from one of the motels, forcing him to sleep on the streets until he was housed in a different motel.  Ramirez Decl. ¶ 20.  In short, Plaintiffs have been living in uncertainty and unstable conditions that have further exacerbated their mental illnesses and disabilities.  Ingram Decl. ¶¶ 20, 28, 32, 36; Ramirez Decl. ¶¶ 26-28 ("I am fearful and I am becoming increasingly paranoid . . . . I am constantly thinking about what is going to happen to me . . . . This situation has exacerbated all of these symptoms."); MacArthur Decl. ¶ 22 ("My depression and anxiety have left me feeling hopeless and helpless."); Ives Decl. ¶ 9 ("Since moving from the Riverbed, my PTSD symptoms have been continually getting worse.").

**D. The County Has Not Provided Adequate Accommodation For Plaintiffs' Physical Disabilities, and Plaintiffs Will Be Forced Back On The Streets In A Condition That Is Worse Than Before.**

Under the Program and Stipulation, the County also was obligated to perform clinical assessments to evaluate Plaintiffs' needs and appropriate resources (*Catholic Worker*, ECF No. 92), but the County did not keep Plaintiffs informed of the appropriate housing and services available to them and failed to address the housing solution after the 30-day motel stay. Kotval Decl., Ex. 14. At best, Plaintiffs were given a list of potential landlords with phone numbers and were told to find housing on their own. Ramirez Decl. ¶ 23; MacArthur Decl. ¶ 18. Those options were not viable for Plaintiffs who have severe mental disabilities and do not even meet the requirements of the landlords on the County's housing list. Ingram Decl. ¶ 31; Ramirez Decl. ¶ 23.

In the meantime, Plaintiff Ramirez received a notice indicating that he will be evicted from his motel on Saturday, March 17, 2018. Ramirez Decl. ¶ 22. Two other Plaintiffs received notices indicating that they will be evicted from their motels on Monday, March 19, 2018. MacArthur Decl. ¶ 20; Ives Decl. ¶ 16. Other Plaintiffs will be displaced next week and back on the streets, but this time they will not have any of their necessary belongings needed to survive on the streets. Robbins Decl. ¶ 13.

## III.     ARGUMENT

Plaintiffs seeking a TRO must establish: (1) likelihood of success on the merits; (2) irreparable harm; (3) a balance of equities in their favor; and (4) public interest.

PLAINTIFFS' RESPONSE TO COURT ORDER AND *EX PARTE* APPLICATION FOR TRO

8

*Winter v. Nat'l Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008); *Carrillo v. Schneider Logistics, Inc.*, 823 F. Supp. 2d 1040, 1042 (C.D. Cal. 2011).  Requests for preliminary relief are evaluated on a sliding scale – where plaintiffs make a strong showing of irreparable harm, they need not make as great a showing with respect to likelihood of success on the merits.  *Alliance for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1131-35 (9th Cir. 2011).  "The urgency of obtaining a [TRO also] necessitates a prompt determination and makes it difficult to obtain affidavits from persons who would be competent to testify at trial."  *Flynt Distrib. Co., Inc. v. Harvey*, 734 F.2d 1389, 1394 (9th Cir. 1984).  Therefore, courts can "give even inadmissible evidence some weight, when to do so serves the purpose of preventing irreparable harm."  *Id.*; *see also Johnson v. Couturier*, 572 F.3d 1067, 1083 (9th Cir. 2009).

## A. Absent A TRO, Plaintiffs Will Suffer Serious Irreparable Harm.

Absent a temporary restraining order, Plaintiffs will suffer immediate irreparable harm.  Irreparable harm has "traditionally [been] defined as harm for which there is no adequate legal remedy, such as an award of damages."  *Arizona Dream Act Coal. v. Brewer*, 757 F.3d 1053, 1068 (9th Cir. 2014); *see also Small v. Avanti Health Sys., LLC,* 661 F.3d 1180, 1191 (9th Cir. 2011) (a plaintiff "need not prove that irreparable harm is certain or even nearly certain," but must demonstrate only a "likelihood" of irreparable harm).

Without the Court's intervention, the County's eviction of Plaintiffs from their motels will cause irreparable harm to Plaintiffs by forcing them to choose between shelters that exacerbate their disabilities or sleeping on the streets without the tents and blankets they used to protect themselves when they lived on the Riverbed.  Plaintiff Ramirez has been told that he must leave his motel by Saturday, March 17.  Ramirez Decl. ¶ 22.  Likewise, Plaintiffs MacArthur and Ives have received notices indicating that they will be evicted from their motels by Monday, March 19.  MacArthur Decl. ¶ 20; Ives Decl. ¶ 16.  Other Plaintiffs will be evicted from their motels in the following week.  Kotval Decl., Ex. 1.  Despite these imminent evictions, the County has not provided any viable alternative housing.  As a result, Plaintiffs will have no choice but to sleep on the streets in the rain and cold weather without any protection from the elements, exposing Plaintiffs to illnesses such as hypothermia and putting their health and well-being at risk.

Moreover, Plaintiffs' imminent eviction from the motels puts their mental health at risk by re-traumatizing Plaintiffs, aggravating existing mental health issues, and causing serious psychological and physiological distress.  Ingram Decl. ¶¶ 32-36.  This uncertainty is causing Plaintiffs immediate and ongoing harm, including immense anxiety, stress, depression, paranoia, and fear due to the imminent threats to their health and safety at the prospect of being without housing and shelter yet again at the hands of the County.  Ramirez Decl. ¶¶ 24, 26-27; MacArthur Decl. ¶ 22 ("My

depression and anxiety have left me feeling hopeless and helpless.  I cannot manage my disabilities under these circumstances and feel overwhelmed by my situation.").

Plaintiffs' very lives will be in danger if they are evicted from their motels, and Plaintiffs have therefore established irreparable harm.  *Chalk v. U.S. Dist. Court Cent. Dist. Of California,* 840 F.2d 701, 710 (9th Cir. 1988) ("Such an injury cannot be adequately compensated by a monetary award after trial."); *see also Michell v. City of Los Angeles*, 16-CV-01750 SJO (GJSx), ECF No. 51 at 10 (C.D. Cal. Apr. 13, 2016) (granting an ex parte TRO application filed by plaintiffs, a group of homeless individuals, and finding that the plaintiffs "may not survive without some of the essential property that [was] confiscated" from them); *Wood v. County of Alameda*, No. C 94 1557, 1995 WL 705139, at *16 (N.D. Cal. 1995) ("[T]he imminent loss of one's home and destitute financial circumstances are the type of truly extraordinary circumstances which can cause sufficient irreparable injury.").

### B. The Balance Of Hardships Tips Sharply In Plaintiffs' Favor.

The concurrently submitted Declarations provide concrete examples of the life-threatening irreparable harm that will take place each day that the Plaintiffs are forced to fend for themselves on the street as a result of the County's movement of Plaintiffs from the Riverbed to motels, failure to preserve Plaintiffs' property, and current eviction of Plaintiffs from motels with no viable alternative solution in place.  Ingram Decl. ¶¶ 31-36; Ramirez Decl. ¶ 24 ("I am completely stressed out by my current

situation and traumatized by the continual false promises by the County."); MacArthur Decl. ¶ 22 ("I am once again confronted with returning to homelessness, but this time I have absolutely nowhere to go and have lost the items I rely on to survive while living outdoors.").  No countervailing interest of the County outweighs the dire impact on Plaintiffs, who are homeless.  The County, which has immense financial resources, faces little to no burden if required to maintain the status quo and keep Plaintiffs in their current motels.  Indeed, this Court has never found that monetary resources are more valuable than the opportunity to save a human life.  In short, the balance of hardships tips sharply in Plaintiffs' favor.

### C. A TRO Is In The Public Interest.

As discussed above, Plaintiffs are some of Orange County's most vulnerable residents, and they are experiencing severe, ongoing violations of their rights that will cause irreparable harm to their mental health and future prospects for obtaining housing and employment.  Ingram Decl. ¶¶ 31-36.  Allowing these violations to continue is against the public interest.  This is especially true given the interests protected by the American with Disabilities Act ("ADA").  "In enacting the ADA, Congress demonstrated its view that the public has an interest in ensuring the eradication of discrimination on the basis of disabilities."  *Enyart v. Nat'l Conference of Bar Exam'rs, Inc.*, 630 F.3d 1153, 1167 (9th Cir. 2011).  "This public interest is served by requiring entities to take steps to 'assure equality of opportunity' for people

with disabilities." *Id.* It also "is always in the public interest to prevent the violation of a party's constitutional rights." *Melendres v. Arpaio*, 695 F.3d 990, 1002 (9th Cir. 2012).

### D. Plaintiffs Will Likely Succeed On The Merits Of Their Claims.[1]

#### 1. Defendant Has Discriminated Against Plaintiffs On The Basis Of Their Disability In Violation Of The ADA And Rehabilitation Act.

To establish a Title II claim under the ADA, Plaintiffs must show that they are (1) qualified individuals with disabilities who were (2) denied the benefit of Defendant's services, programs, or activities, or were otherwise discriminated against by Defendant, (3) by reason of their disability. *Weinreich v. Los Angeles County Metro. Transp. Auth.*, 114 F.3d 976, 978 (9th Cir. 1997). The same requirements apply to claims under Section 504 of the Rehabilitation Act ("Section 504") with the additional requirement that the program at issue receives federal financial assistance. 29 U.S.C. § 794; *McGary v. City of Portland*, 386 F.3d 1259, 1269 n. 7 (9th Cir. 2004). Here, the Program is funded in part by the U.S. Department of Housing and Urban Development, (Answer ¶ 38) so analysis of the remaining elements of the Title II and Section 504 claims is identical.

---

[1] For purposes of this TRO, Plaintiffs address the First, Second, and Third Causes of Action asserted in their complaint.

a. <u>Plaintiffs Are Qualified Individuals With Disabilities.</u>

Under the ADA, a disability is defined as a "physical or mental impairment that substantially limits one or more of the major life activities," such as caring for oneself, concentrating, thinking, and communicating.  42 U.S.C. §§ 12102(1), (2)(A); 29 CFR § 1630.2(j)(3)(iii).  Here, Plaintiffs are qualified individuals with disabilities under the ADA because they suffer from severe mental and physical impairments that limit their ability to work or adequately care for themselves.  Ingram Decl. ¶ 31.

b. <u>Plaintiffs Were Excluded From Participation In And Denied Benefits Of The Program And Otherwise Discriminated Against By Defendant.</u>

The Program is subject to the broad scope of Title II and Section 504.  *Fortyune v. City of Lomita*, 766 F.3d 1098, 1101-02 (9th Cir. 2014) (any program that "is a normal function of a government entity" is subject to Title II and Section 504).  A plaintiff may establish a violation of Title II and Section 504 if they were denied "meaningful access to state services by reason of their disability," even if the allegedly discriminatory program is facially neutral.  *Crowder v. Kitagawa*, 81 F.3d 1480, 1485 (9th Cir. 1996).  A program denies meaningful access to individuals with disabilities where it fails to address or provide for their unique needs.  *Communities Actively Living Independent and Free v. City of Los Angeles*, No. CV 09-0287 CBM, 2011 WL 4595993, at *13 (C.D. Cal. 2011) (plaintiffs established lack of meaningful access "due to the City's failure to address or provide for their unique needs").  A public

entity is required to make reasonable accommodations to avoid discriminating against persons with disabilities, unless it would be unduly burdensome or would fundamentally alter the nature of the program it provides.  28 C.F.R. § 35.130(b) (7); *Cohen v. City of Culver City*, 754 F.3d 690, 695 (9th Cir. 2014).  A plaintiff can establish intentional discrimination where the defendant knew an accommodation was required, and still failed to act.  *Duvall v. County of Kitsap*, 260 F. 3d 1124, 1139 (9th Cir. 2001).

Here, Plaintiffs were denied meaningful access to the Program because the Program failed to provide accommodations that would make it accessible to people with disabilities, thereby excluding Plaintiffs from the benefits of the Program, such as adequate mental health services and appropriate housing options.  Robbins Decl. ¶ 5.  For example, the County's assessments failed to include any in-depth evaluation about the individual's medical background, mental health, experience with trauma, or how their disabilities inform their housing needs.  Ramirez Decl. ¶¶ 12-14; Robbins Decl. ¶ 12.  These assessments were conducted without any attempt to build trust or rapport by uniformed HCA staff who were meeting these individuals for the first time.  The assessments lasted between 10 to 45 minutes and were often conducted in rushed manner, and individuals were provided with little to no information about their options.  MacArthur Decl. ¶¶ 18, 19.  In most instances, Plaintiffs were only offered a phone number to call City Net for information about temporary shelters and were

denied access to more appropriate housing options to accommodate their disabilities. MacArthur Decl. ¶ 19.  No guidance or assistance was provided to them to help navigate the procedural hurdles associated with securing placement at such an entity, thereby functionally denying them any access to a purported benefit.  Ingram Decl. ¶ 31.

Plaintiffs are unable to access shelters due to their disabilities.  The County's shelters are crowded, noisy, unsanitary, and often violent, and lack the privacy that Plaintiffs need to manage their disabilities.  Ingram Decl. ¶¶ 15, 35.  The Plaintiffs who have attempted to stay in emergency shelters, including Plaintiffs Ramirez, Ives, and MacArthur, become psychologically triggered and re-traumatized by these conditions, resulting in the deterioration of their health.  Ingram Decl. ¶ 35; MacArthur Decl. ¶13; Ives Decl. ¶ 7. While temporary shelters may be appropriate housing solutions for non-disabled homeless, they are not appropriate for mentally ill homeless individuals who are triggered by conditions in the shelters and suffer deteriorating mental health symptoms when subject to them. Ingram Decl. ¶ 15; Robbins Decl. ¶¶ 7, 15; MacArthur Decl. ¶ 13; Ives Decl. ¶ 7.

Defendant knew that an accommodation was required in order for mentally disabled homeless to have meaningful access to the Program.  According to a county-commissioned study, 51% of homeless individuals residing in the Riverbed had disabilities and 42% had mental health concerns.  RJN at ¶ 6.  Moreover, in January

and February 2018, Plaintiffs submitted multiple reasonable modification requests to the County, informing the County of Plaintiffs' disabilities and their inability to access emergency and transitional shelters, and requesting a reasonable modification of the Program to accommodate their disabilities.  Kotval Decl., Exs. 4-10; Ramirez Decl. ¶ 12; MacArthur Decl. ¶ 14; Ives Decl. ¶ 8.  However, the County has denied or ignored all of Plaintiffs' reasonable modification requests, excluding Plaintiffs from participating in its Program and Stipulation by reasons of Plaintiffs' disabilities. Kotval Decl., Exs. 1, 11; Ramirez Decl. ¶ 12.

None of Plaintiffs' requested accommodations fundamentally alter the nature of the Program, nor are they unduly burdensome.  All of the accommodations seek to further the Program's goal of providing appropriate housing for chronically homeless individuals.  The County has applied for and received substantial financial resources for homeless services and housing resources, including $786,481,342 in fiscal year 2016-2017 alone.[2]  It is also estimated that the County has roughly $230 million in unused funds that can be used to address homelessness.[3]  Even accepting the County's estimation that each permanent housing unit costs between $100,000 and $110,000, using just half of the available $230 million could provide permanent housing for 1,000 homeless residents.  The costs of homelessness to the County actually declines

---

[2] County of Orange, County Executive Office, *An Assessment of Homeless Services in Orange County* at 42 (Oct. 18, 2016).
[3] Nick Gerda, Orange County Has at Least $230 Million It Could Use to Address Homelessness, *Voice of Orange County*, (March 8, 2018) county-government-has-at-least-230-million-it-could-use-to-address-homelessness.

PLAINTIFFS' RESPONSE TO COURT ORDER AND *EX PARTE* APPLICATION FOR TRO

17

when the homeless are housed, even taking into consideration the program costs of

permanent supportive housing.[4]

### 2.   The Program Violates Substantive Due Process.

Under the Substantive Due Process Clause of the Fourteenth Amendment, the

state deprives a person of a substantive due process right if it affirmatively places the

person in a position of danger. *Wood v. Ostrander*, 879 F.2d 583, 583 (9th Cir. 1989).

Liability under substantive due process requires: (1) official state action that

affirmatively places an individual in danger; and (2) deliberate indifference to that

danger. *Kennedy v. City of Ridgefield,* 439 F.3d 1055, 1062 (9th Cir. 2006).   State

action affirmatively places an individual in danger when it leaves the person "in a

situation that was more dangerous than the one in which they found him." *Kennedy,*

439 F.3d at 1062.   Deliberate indifference requires proof of (1) serious risk of harm,

(2) defendant's actual knowledge of that risk, and (3) defendant's failure to take

obvious steps to address that risk. *L.W. v. Grubbs,* 92 F.3d 894, 900 (9th Cir. 1996).

Although not ideal, for years the Riverbed provided Plaintiffs with stability, a

private space, and community, which allowed Plaintiffs to better manage their

disabilities.   Ramirez Decl. ¶ 11; MacArthur Decl. ¶ 11.   Plaintiffs lived in

encampments where they had access to tents and blankets that protected them from the

cold, were able to access nearby food resource, and built a community to rely on one

---

[4] D. Snow, R. Goldberg, *Homelessness in Orange County: The Costs to Our Community* at 7, 26 (2017).

another for basic survival.  Ramirez Decl. ¶ 11; MacArthur Decl. ¶ 11.  In its abrupt eviction of Plaintiffs, the County affirmatively placed Plaintiffs in danger by uprooting Plaintiffs from their community and cutting them off from the resources they rely on for survival and placing them in temporary motel rooms without access to food, telephones, transportation, or health services, all of which exacerbates their mental health symptoms.  Plaintiffs now are in locations that are unfamiliar to them, which is harmful to their health.  Ingram Decl. ¶¶ 20, 28, 32, 36; Robbins Decl. ¶ 8; MacArthur Decl. ¶ 16; Ives Decl. ¶ 9.

Further, the County's eviction of Plaintiffs from the motels forces Plaintiffs to choose between shelters that aggravate their disabilities or sleeping on the streets without the community or the protective tents and blankets they were forced to leave at the Riverbed.   Either choice immediately threatens each Plaintiff's fragile health. Ingram Decl. ¶¶ 31-36; *see also Sanchez v. City of Fresno*, No. 1:12–CV–00428, 2014 WL 2042058 (E.D. Cal. 2014) (finding that the availability of alternative shelter was not enough to avoid liability if the action left Plaintiffs in more dangerous situations); *Munger v. City of Glasgow,* 227 F.3d 1082 (9th Cir. 2000) (finding officials liable for hypothermia death of visibly drunk bar patron after ejecting him from a bar on a bitterly cold night).

The County acted with deliberate indifference because it knew of the serious risk to Plaintiffs' health and well-being and failed to take action to address that risk.

*Kennedy,* 439 F.3d at 1064.   Indeed, Plaintiffs submitted reasonable modification requests to the County in January 2018, before Plaintiffs' eviction from the Riverbed, and the County was therefore on notice of Plaintiffs' disabilities and their requested accommodations.  Kotval Decl., Exs. 4-10.  Plaintiffs explained to the County that the conditions at the emergency shelters made them inaccessible to Plaintiffs because the shelters would aggravate their mental health issues and traumatize them.  Kotval Decl., Exs. 4-10.  Further, the County conducted its own health assessments of the Plaintiffs before they were displaced and was therefore aware of Plaintiffs' various disabilities, yet the County failed to take actions that would mitigate the danger to Plaintiffs' health.  Ramirez Decl. ¶¶ 12-14.

By evicting Plaintiffs from their motels without any appropriate housing option—and without any of the tents, blankets, and other items they used for protection from the elements—the County is affirmatively exposing Plaintiffs to hypothermia and other physical harm from exposure to cold weather.  *Sanchez,* 2014 WL 2042058, at *11 (acknowledging that danger and serious risk of harm can be created by environmental exposure to weather or injury by a third party).  Plaintiffs have therefore established a likelihood of success on their substantive due process claim.

### E.  A Bond Is Not Required.

"Although Federal Rule of Civil Procedure 65(c) generally provides that a preliminary injunction will not issue except upon the giving of security, it is not

required where plaintiffs are indigent or where considerations of public policy make waiver of a bond appropriate." *Miller v. Carlson*, 768 F. Supp. 1331, 1340 (N.D. Cal. 1991) (citing, *inter alia, California ex rel. Van De Kamp v. Tahoe Regional Planning Agency,* 766 F.2d 1319, 1325-26 (9th Cir. 1985), *modified*, 775 F.2d  998.)  As Plaintiffs are indigent, no bond should be required.

## IV.   CONCLUSION

For each of the foregoing reasons, Plaintiffs respectfully request that the Court issue a temporary restraining order requiring the County to maintain the status quo and keep Plaintiffs in disability appropriate housing, such as their current motel placements, until the County provides appropriate resources and housing that it committed to providing under the Program.  Plaintiffs also request that the Court issue a temporary restraining order requiring the County to maintain the status quo and keep individuals that reported a disability to the County during the clinical assessments, or who the County otherwise has reason to believe have a disability,  in disability appropriate housing, such as their current motel placements, until the County provides the appropriate resources and housing that it committed to providing under the Program.  Plaintiffs also request that the Court set an order to show cause why a preliminary injunction should not issue.

Dated: March 15, 2018

Respectfully submitted,

LEGAL AID SOCIETY OF ORANGE COUNTY


_____/S/_ Lili V Graham_____
By: LILI V GRAHAM