LEGAL AID SOCIETY OF ORANGE COUNTY
  Lili V. Graham (Bar No. 284264)
    lgraham@legal-aid.com
  Sarah J. Gregory (Bar No. 303973)
    sgregory@legal-aid.com
  Michelle Kim Kotval (Bar No. 293830)
    mkotval@legal-aid.com
  Crystal Sims (Bar No. 62796)
    csims@legal-aid.com
2101 North Tustin Avenue
Santa Ana, California 92705
Telephone: 714.571.5282
Facsimile: 714.571.5270

*Attorneys for Plaintiffs*
[ADDITIONAL COUNSEL ON NEXT PAGE]

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA – SOUTHERN DIVISION

| | |
|---|---|
| DAVID RAMIREZ, SHARON SWEAT, STEPHENIE SAINT VINCENT, RAYA IVES, DEREK MACARTHUR, KIM GRAY, and ERIK TEASLEY as individuals; PEOPLE'S HOMELESS TASK FORCE, an unincorporated association;<br><br>            Plaintiffs,<br><br>   vs.<br><br>THE COUNTY OF ORANGE,<br><br>            Defendant. | No.  8:18-cv-00220-DOC-KES<br><br>**FIRST AMENDED CIVIL RIGHTS COMPLAINT FOR DECLARATORY RELIEF AND INJUNCTIVE RELIEF:**<br><br>AMERICANS WITH DISABILITIES ACT (42 U.S.C. § 12132); SECTION 504 OF THE REHABILITATION ACT (29 U.S.C. § 794); UNITED STATES CIVIL RIGHTS ACT (42 U.S.C. § 1983); U.S. AND CALIFORNIA CONSTITUTIONS; CALIFORNIA CIVIL CODE § 52.1; FAIR HOUSING ACT (42 U.S.C. §§ 3601 *et seq.*); FEHA (Cal. Gov't Code §§ 127920 *et seq.*); CALIFORNIA COMMON LAW<br><br>**JURY TRIAL DEMANDED** |

1

LATHAM & WATKINS LLP
  Michele D. Johnson (Bar No. 198298)
    *michele.johnson@lw.com*
  Andrew Gray (Bar No. 254594)
    *andrew.gray@lw.com*
  Geelan A. Fahimy (Bar No. 287646)
    *geelan.fahimy@lw.com*
650 Town Center Drive, 20th Floor
Costa Mesa, California  92626-1925
Telephone:  714.540.1235
Facsimile:  714.755.8290

**JURISDICTION AND VENUE**

1.     The Court has jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1343, 42 U.S.C. § 12132 and 42 U.S.C. § 1983 because Plaintiffs' claims arise under the laws and Constitution of the United States.  Pursuant to 28 U.S.C. § 1367, this Court has supplemental jurisdiction over the state law and state constitutional claims because Plaintiffs' state claims are related to Plaintiffs' federal claims, arise out of a common nucleus of operative facts, and form part of the same case or controversy under Article III of the U.S. Constitution.

2.     Venue is proper in the Central District of California because Defendant resides in the District and all events giving rise to Plaintiffs' claims occurred in the District. The relief Plaintiffs seek is within this Court's power to grant.

**INTRODUCTION**

3.     Hundreds of Orange County's most vulnerable homeless residents experienced continual trauma as large squads of armed Sheriff Deputies and local law enforcement patrolled their makeshift homes along the Santa Ana Riverbed, threatening arrests and citations if people did not disperse.  The County began its mass eviction of the homeless encampments at the Riverbed on January 22, 2018, and the homeless community, including Plaintiffs, has been living in constant fear and stress ever since.

4.     These vulnerable residents were afraid to leave their tents and their few meager possessions as they watched Orange County personnel swarm the Riverbed wearing

plastic suits, helmets, and gloves, cleaning out property that the County deemed abandoned and throwing those items into garbage trucks.  Law enforcement arrested any individual who has been out of contact with their probation or parole officer. Disabled homeless individuals, including Plaintiffs David Ramirez and Sharon Sweat, were handcuffed for suspected criminal activity but then released when the officers realized those individuals did nothing wrong.  Homeless women were afraid to change their clothes in their tent out of fear that at any moment an officer would intrude, triggering flashbacks of trauma and abuse.

5.     Yet Plaintiffs David Ramirez, Sharon Sweat, Stephenie Saint Vincent, Raya Ives, Derek MacArthur, Kim Gray, and Erik Teasley, homeless individuals with various disabilities, remained on the Riverbed for a period of time despite the hostile environment created by the County because they literally had nowhere else to go. Their disabilities made it nearly impossible for them to live on the city streets or in any emergency shelter or transitional shelter, and they were terrified of leaving the only stable living environment available to them.

6.     The County announced its mass eviction on January 8, 2018 under the pretext of conducting flood control maintenance, giving residents — many of whom had been at the Riverbed for years — just two weeks' notice before the eviction began on January 22, 2018.  The County decided to evict these residents even though it was in the midst of implementing a program to relocate every willing homeless person on the Riverbed to

appropriate housing and services before requiring them to leave County property.  The County's relocation of individuals living at the Riverbed was part of a County program to provide enhanced housing and services to the County's homeless population (the "Program").  Under the Program, the County committed new and existing resources to assist homeless residents countywide and employed outreach workers tasked with assessing each resident for appropriate case management, supportive services, and housing.  As of January 19, 2018, the County reported that 171 people on the Riverbed were undergoing case management and awaiting housing.  However, many other homeless residents, particularly people with disabilities such as Plaintiffs, have yet to access the Program at all, or have been denied access to the Program by reason of their disabilities.

7.      When it comes to solving homelessness, the County is the lead public agency.  The County controls much of the land where the homeless reside, including the Riverbed, decides when and how law enforcement will be utilized, employs the outreach workers, and selects what housing and services options will be available to homeless individuals.  The County also sits on over *$700 million* of available financial resources earmarked to meet the needs of the County's most vulnerable residents, including people experiencing homelessness.  On many occasions, Plaintiff People's Homeless Task Force ("PHTF") has attended County Board of Supervisor meetings to demand the use of the County's available money to assist individuals at the Riverbed

and the homeless population.  Despite PHTF's efforts, and despite the desperate need for permanent solutions, vast portions of the County's fund goes unspent, including $146 million for housing vouchers, $67.5 million for residential mental health care, and $227 million in CalWORKs funding.

8.     The County is well aware that large portions of the homeless population, particularly those individuals who lived at the Riverbed, experience physical and / or mental health disabilities.  Yet the County has implemented the Program in a way that is inaccessible to people with disabilities, resulting in an outright exclusion from the Program or a denial of equal access to the benefits of the Program, including case management, services, and permanent housing that appropriately accommodate their disabilities.  After the County announced its mass eviction, Plaintiffs submitted formal reasonable modification requests to the County, informing the County of their physical and mental disabilities and requesting equal access to the Program.  However, despite Plaintiffs' multiple attempts to engage with the County, the County refused to discuss reasonable modification of the Program.  Plaintiffs were told their only option was to participate in the Program without a modification.

9.     After other homeless individuals living on the Riverbed sued the County for violations of their constitutional rights, the County decided to relocate the Riverbed population to temporary motels while it continued to implement its Program.  In as little as ten days, the County relocated over 700 individuals from the Riverbed to

various motels throughout the County.  Given the speed with which the relocation was completed, many people, including Plaintiffs, were forced to leave their tents, blankets, and other property on the Riverbed.  When the motel placements expired at the end of 30 days, many homeless people with disabilities were given the option of moving into temporary shelters or back to the streets — only this time without the tents and blankets they used for protection on the Riverbed.  As County Supervisor Shawn Nelson stated, "it made more sense to have a management plan before we start clearing the riverbed homeless population, but no one cooperated . . . . Everyone points to somewhere else."

10.     The County's actions and omissions are inconsistent with the Program's goal to "help homeless individuals" and "to provide access to permanent housing options for the individuals encamped along the flood control channel."  Moreover, the County's actions and omissions violate the rights of Plaintiffs and the hundreds of other disabled homeless residents under federal law.  Plaintiffs bring this lawsuit to challenge Defendant's unlawful discrimination against Plaintiffs based on their disabilities.

### **PARTIES**

**A.**     **Plaintiffs**

11.     Plaintiff DAVID RAMIREZ ("Ramirez") is 33 years old and has been homeless for over two years.  He was born and raised in Orange County.  Ramirez is disabled as

defined by the ADA[1] and meets the definition of "chronically homeless" as defined by the U.S. Department of Housing and Urban Development ("HUD").[2]  As a child, Ramirez was a victim of severe abuse and neglect.  This trauma contributed to Ramirez's development of several mental health conditions, including bipolar disorder, depression, and anxiety.  These mental health disabilities have prevented Ramirez from holding the steady full-time employment necessary to afford market-rate rents in Orange County.

12.    Ramirez and his husband, who also suffers from mental health disabilities, became homeless in approximately 2015, when Orange County Housing Authority terminated the couple's Shelter-Plus-Care Housing Voucher.  Ramirez began living in his car until he fell behind on his car payments and the car was repossessed.  Without his car and no housing option, Ramirez and his husband began living behind a storage

---

[1] "Disability" means "(A) a physical or mental impairment that substantially limits one or more major life activities; (B) a record of such an impairment; or (C) being regarded as having such an impairment."  42 U.S.C. § 12101(1).  "[M]ajor life activities include but are not limited to caring for oneself, performing manual tasks, seeing, hearing, eating, sleeping, walking, standing, lifting, bending, speaking, breathing, learning, reading, concentrating, thinking, communicating, and working."  *Id.* § 12101(2)(A).  Major life activity also includes the operation of a major bodily function including the immune system, digestive, neurological, brain, respiratory, and reproductive functions.  *Id.*  § 12101(2)(B).

[2] HUD regulations define "chronically homeless" to mean an individual with a disability who lives in a place not meant for human habitation, and has been homeless continuously for at least 12 months or on at least four separate occasions in the last three years.  24 C.F.R. § 91.5(1).  A "homeless individual" is one who lacks a fixed, regular, and adequate nighttime residence.  42 U.S.C. § 11302(a)(1).

facility in Fountain Valley until Fountain Valley police evicted the couple from the storage facility and told them to move to the Riverbed, where local police would not bother them.  Out of options, Ramirez moved to the Fountain Valley section of the Riverbed in approximately February 2017.

13.     In November 2017, the County evicted Ramirez from the Fountain Valley section of Riverbed and arrested his husband for trespassing.  In the course of the Fountain Valley Riverbed eviction, Ramirez informed County workers of his and his husband's mental health disabilities and told them that he had nowhere else to go and requested additional time to move as a reasonable accommodation for his disability. However, the County only offered to drive Ramirez and his husband to the County's "Courtyard" shelter in Santa Ana, a former bus terminal that was originally meant for 200-250 people, but that now shelters over 400 people each night on closely packed cots.  With nowhere else to go, Ramirez accepted the County's offer.  However, the overcrowded, loud, and dirty conditions at the Courtyard immediately began to trigger Ramirez's and his partner's mental health symptoms.  After only two nights at the Courtyard, another Courtyard resident became aggressive and punched Ramirez in the face, resulting in Ramirez's eviction from the Courtyard.  Ramirez returned to Fountain Valley, where he slept in an alley for approximately one month, until the Fountain Valley police pushed the couple out again.  Once again, Ramirez had nowhere to go but the Riverbed.  He lived on the Riverbed, north of Chapman Avenue,

from approximately December 2017 until the County relocated him to a temporary

motel in February 2018.

14.     Plaintiff SHARON SWEAT ("Sweat") is 49 years old and has been homeless for

16 years.  She lived at the Riverbed for approximately 14 years.  Sweat is disabled as

defined by the ADA and meets the definition of chronically homeless as defined by

HUD regulations.  As a child, Sweat was a victim of severe abuse and neglect,

ultimately resulting in her removal from the family home by Child Protective Services.

Sweat has suffered extreme trauma as an adult, including surviving sexual assault and

domestic violence.  These traumas contributed to Sweat's development of severe

depression and anxiety.  As a result of her mental health conditions, Sweat experiences

memory loss, insomnia, flashbacks, paranoia, reclusiveness, and difficulty trusting

others.  These symptoms are heightened when she is under stress.  These disabilities

have prevented Sweat from holding the steady full-time employment necessary to

afford market-rate rents in Orange County.

15.     Sweat became homeless in approximately 2002 after escaping from an abusive

relationship.  She lived in the Santa Ana Civic Center for approximately two years,

until she was forced to leave by Santa Ana Police.  With nowhere else to go, Sweat

moved to the Riverbed, where she lived until the County relocated her to a temporary

motel in February 2018.  Although not ideal, the Riverbed allowed Sweat to create the

kind of privacy, space, and control that she needs to manage her disabilities.  She also

had a community she could rely on.  She keeps an emotional support animal that helps her cope with her depression and anxiety.

16.     Plaintiff STEPHENIE SAINT VINCENT ("Saint Vincent") is 43 years old and has been homeless for almost two years.  Saint Vincent is disabled as defined by the ADA and meets the definition of chronically homeless as defined by HUD regulations. Saint Vincent suffered years of sexual abuse as a child.  Due in part to the trauma she experienced, Saint Vincent now suffers from a number of mental health conditions, including multiple personality disorder, borderline schizophrenia, bipolar disorder, and anxiety.  Saint Vincent also has physical disabilities, including sleep apnea and leg and arm injuries that required two separate surgeries last year.  Saint Vincent receives Supplement Security Income ("SSI") because her disabilities prevent her from working.  Her SSI income is insufficient to enable her to afford market-rate rents in Orange County.

17.     Saint Vincent became homeless in approximately 2016, when she was evicted from her home after her landlord gave her an ultimatum of engaging in sexual acts with him or moving off the premises.  She chose to leave.  With nowhere to go, Saint Vincent slept in various locations around Orange County, including motel rooms, city streets, and a temporary shelter.  The shelter's crowded, noisy conditions triggered her mental health symptoms, forcing her to leave.  With nowhere else to go, Saint Vincent moved to the Riverbed, where she stayed until the County relocated her to a temporary

motel in February 2018.  Although not ideal, the Riverbed allowed Saint Vincent to create community and achieve the personal space and control she needs to manage her disabilities.

18.     Plaintiff RAYA IVES ("Ives") is 40 years old and has been homeless for seven years.  She lived at the Riverbed for approximately one year, and she stayed there until the County relocated her to a temporary motel in February 2018.  Ives is disabled as defined by the ADA and meets the definition of chronically homeless as defined by HUD.  Ives is a victim of domestic violence.  As a result of years of violence at the hands of her former partner, who was later convicted of felony assault, Ives suffers from post-traumatic stress and severe anxiety.  Her mental health disabilities often lead to insomnia and affect her ability to interact with others, particularly men.  Ives also suffered physical injuries that have left her with constant knee pain and fatigue.  These disabilities have prevented Ives from holding the steady full-time employment necessary to afford market-rate rents in Orange County.

19.     Due to her former abusive relationship, Ives lost her Section 8 housing voucher.  Without that support, Ives had no place to live and became homeless.  Over the last several years, Ives has lived at over a dozen shelters and transitional housing for domestic violence survivors.  None of these short-term housing options resulted in access to permanent affordable housing.  These short-term shelters also triggered her mental health conditions and, after each stay, Ives had no choice but to return to living

on the streets.  Ives has attempted to stay at the Courtyard two times in the last year.

On both occasions, Ives was sexually harassed by male staff and residents, re-

traumatizing her and causing her to fear for her safety.

20.     Plaintiff ERIK TEASLEY ("Teasley") is 47 years old and homeless.  Teasley is

disabled as defined by the ADA and meets the definition of chronically homeless as

defined by HUD.  As a child, Teasley was a victim of physical abuse and emotional

neglect.  As a result of that trauma, Teasley experiences depression and anxiety.  He

also suffers from flaccid paralysis as a result of an accident in 2007 which left his right

arm with limited mobility and strength.  Teasley's mental and physical disabilities have

prevented him from holding steady full-time employment, which ultimately led to his

homelessness.

21.     Teasley moved to the Fountain Valley section of the Riverbed about two years

ago.  There, he was able to keep a tent that protected him from the elements and

provided a degree of privacy.  However, in November 2017, County officials swept the

area and forced Teasley to move.  Teasley gathered what he could in the short time he

was given and with no other place to go, moved to the northern area of the Riverbed,

where he stayed until the County relocated him to a temporary motel in February 2018.

22.     Plaintiff DEREK MACARTHUR ("MacArthur") is 50 years old and homeless.

He lived at the Riverbed for approximately ten months.  MacArthur is disabled as

defined by the ADA and meets the definition of chronically homeless as defined by

HUD.  MacArthur has been diagnosed with bipolar disorder, depression, and anxiety. He also suffers from various medical conditions, including severe spinal stenosis and respiratory problems.  As a result of his disabilities, MacArthur requires privacy and cannot tolerate exposure to groups of people he does not know.  These mental and physical disabilities have prevented MacArthur from holding steady full-time employment that would enable him to afford market-rate rents in Orange County, ultimately resulting in homelessness.

23.     Before the Riverbed, MacArthur lived on the streets of Anaheim.  The Anaheim Police Department regularly confiscated and destroyed items essential to MacArthur's survival, including his tent and sleeping bag.  The Anaheim Police Department also repeatedly ticketed and arrested MacArthur for loitering or obstructing a sidewalk.  On multiple occasions, Anaheim police instructed MacArthur to move to the Riverbed. This constant police harassment took a toll on MacArthur's health.  In approximately May 2017, MacArthur left Anaheim and moved to the Riverbed, where he stayed until the County relocated him to a temporary motel in February 2018.  Although not ideal, the Riverbed allowed MacArthur to create and control the personal space he needs to manage his disabilities.

24.     Plaintiff KIM GRAY ("Gray") is 49 years old and has been homeless for over 8 years.  She lived at the Riverbed for most of the time she has been homeless.  Gray is disabled as defined by the ADA and meets the definition of chronically homeless as

defined by HUD.  Gray suffers from various mental health conditions, including panic attacks, anxiety, and depression.  Gray lived at the Riverbed with her husband until early 2017, when she and her husband were forced to move from one area of the Riverbed to another.  About a month later, her husband suffered a cardiac arrest and died.  The death of her husband worsened her mental health conditions and increased her depression and anxiety, causing her to feel extremely vulnerable.  She requires a private space and a companion animal to manage her disabilities.  These mental health disabilities have prevented Gray from holding steady full-time employment that would enable her to afford market-rate rents in Orange County.  Gray stayed at the Riverbed until the County relocated her to a temporary motel in February 2018.

25.     Plaintiff PEOPLE'S HOMELESS TASK FORCE ("PHTF") is a grassroots association formed to assist and advocate on behalf of homeless residents of Orange County.  PHTF's mission is to advocate for a Housing First model in Orange County as a solution to ending homelessness.  PHTF members advocate at local city council meetings and County Board of Supervisors meetings to urge local officials to use public monies to fund homeless services programs, including permanent supportive housing options.

26.     As a result of the County's eviction of Riverbed residents, PHTF has been required to divert enormous resources away from its mission in order to provide assistance to those residents.  PHTF has shifted resources to: (1) addressing the County

Board of Supervisors to oppose the eviction; (2) raising public awareness of the plight of the homeless and the negative impacts of the eviction; (3) contacting County personnel to gather information about the eviction and sharing that information with homeless residents; (4) attempting to identify safe alternative locations for people from the Riverbed to live; (5) mobilizing transportation and other equipment to assist people being evicted; (6) monitoring and recording the activity of County personnel along the Riverbed to identify potential civil rights violations; (7) assisting individuals who have been moved to motels, including triage for people without access to food or transportation; and (8) working to reassure homeless residents experiencing mental health symptoms caused by the eviction.

27.     Due to this drain on its resources, PHTF has been unable to engage in advocacy relating to the Housing First model or to serve homeless residents in other parts of Orange County.  The vast majority of people who have requested PHTF's assistance are chronically homeless individuals experiencing physical and / or mental disabilities who have been unable to access disability appropriate housing.

**B.     Defendant**

28.     Defendant COUNTY OF ORANGE ("County" or "Defendant") is a governmental entity with the capacity to sue and be sued.

29.     Defendant, its employees and agents, participated personally in the unlawful conduct challenged herein and, to the extent that they did not personally participate,

16

authorized, acquiesced, set in motion, or otherwise failed to take necessary steps to prevent the acts that resulted in the unlawful conduct and the harm suffered by Plaintiffs.  Each acted in concert with each other.  The challenged acts caused the violation of Plaintiffs' rights.

## FACTUAL ALLEGATIONS
## HOMELESSNESS IN ORANGE COUNTY

30.    In 2017, at least 4,792 people were homeless in the County, according to the Orange County Point-In-Time Count, an annual countywide census of people experiencing homelessness.  Of those, 54% went unsheltered on any given night.  Over the last several years, the number of unsheltered individuals has steadily increased, due in part to the lack of emergency shelters and permanent affordable housing available in the Orange County housing market, but also due to the County's failure to address the systemic causes of homelessness.

31.    For years, the Riverbed was home to one of the largest concentrations of unsheltered homeless people in Orange County.  The largest homeless encampments could be found along the banks of the Riverbed in Anaheim, Orange, and Santa Ana.

32.    The County allowed homeless individuals to reside at the Riverbed for many years.  For example, Plaintiff Sweat lived on the Riverbed for approximately 14 years. Although the Riverbed had minimal facilities for basic human activities, the population at the Riverbed continued to grow over the last decade as Orange County's cities increasingly criminalized their homeless populations, often telling homeless

individuals, including individual Plaintiffs, that they must leave city limits or that they should go to the Riverbed because it is not patrolled by local police.  According to a 2016 study by the American Civil Liberties Union, 33 of the 34 cities in the County criminalize homelessness,[3] including by seizing homeless residents' property and citing or arresting them for activities that are the unavoidable consequences of being homeless, including sitting, sleeping, or storing property.

33.     In response to increasing homelessness in the County, Orange County's cities have chosen to close off public spaces to homeless residents and increase law enforcement in the homeless community.  In 2016, the City of Santa Ana evicted hundreds of people from its Civic Center, fencing off public spaces and ticketing or arresting people for camping or possessing too much property, forcing many people to move to the Riverbed.

34.     In February 2017, homeless individuals living at the Riverbed sued the County in the United States District Court regarding the County's unconstitutional seizure and destruction of homeless residents' property.  On March 7, 2017, the parties stipulated to, and the Court granted, a preliminary injunction preventing the County from

---

[3] ACLU SoCal, *Nowhere to Live: the Homeless Crisis in Orange County & How to End It* at 6 (2016).

violating individuals' constitutional rights in a designated area of the Riverbed north of the Santa Ana Freeway and south of Ball Road (the "Injunction Area").[4]

35.    In September 2017, the City of Anaheim declared a "state of emergency" related to increasing rates of homelessness and passed "Operation Home Safe," a program ostensibly designed to address homelessness.  Although the resolution empowered staff to increase shelter and services, including identifying locations for at least 500 shelter beds or other housing options and expediting the completion of an additional 100 beds at the Bridges at Kraemer Place ("Kraemer") shelter, Anaheim also ordered an increase in law enforcement in homeless communities.  The increase in law enforcement occurred immediately, with Anaheim police joining the Orange County Sheriff to patrol in and around the Riverbed.  However, upon information and belief, not a single additional shelter bed was added as a direct result of Operation Home Safe.

36.    In November 2017, the County evicted an encampment of more than 100 unhoused people living in the Fountain Valley section of the Riverbed, including Plaintiff Ramirez.  During the County's November 2017 eviction, County workers directed many people to move to the Injunction Area.  Upon information and belief, County workers explained that the Injunction Area would be a safe place to camp and that no evictions would take place there for at least a year.

---

[4] *See Schuler v. County of Orange*, No. 8:17-cv-00259 DOC KES, Dkt. Nos. 1, 3 (C.D. Ca. 2017).

19

37.     Unable to live in the cities or the southern sections of the Riverbed, hundreds of people crowded into the Injunction Area.  While life at the Riverbed was difficult, homeless individuals used the Riverbed as a home of last resort, where they were not subjected to law enforcement targeting homeless communities, such as expensive ticketing, property seizures, or arrests by local police departments.

38.     In addition, the Riverbed allowed Plaintiffs and others similarly situated to achieve stability and privacy.  Personal space is extremely important to the health and well-being of people experiencing disabilities, including Plaintiffs.  According to a recent County-commissioned study, the individuals who lived at the Riverbed are some of the most vulnerable people in all of Orange County.  Over 51% of homeless residents surveyed reported having a disability, and over 42% stated that they have mental health concerns.[5]  Additionally, 37.5% of those surveyed were victims of domestic violence.

39.     As these statistics show, there is a strong link between disability and homelessness.  Low-income individuals already face an overwhelming shortage of housing options in Orange County, and housing is even more limited for people experiencing a disability, who often require affordable, permanent, and accessible housing with wrap-around services, such as permanent supportive housing.

---

[5] City Net, *Census of Homeless Individuals in the Flood Control Channel* (2017).

## THE COUNTY'S FUNDING TO END HOMELESSNESS

40.     The County is the lead public agency receiving federal funding to address

Orange County's homelessness issues.  According to *An Assessment of Homeless*

*Services in Orange County*, published by the County Executive Office in 2016, the

County had $786,481,342 for homeless services in fiscal year 2016-2017 alone.[6]  Of

that total, nearly $700 million was identified as unspent "available" funds.  This

staggering number includes over $146 million for housing vouchers, $8 million for

affordable housing development, $67.5 million for mental health treatment and

residential care, and nearly $227 million in CalWORKS funding, which includes

funding to assist victims of domestic violence.[7]  The County has received hundreds of

millions of dollars in California Mental Health Services Act funds for the purpose of

assisting homeless individuals with mental disabilities, much of which has gone

unspent.[8]  In its Consolidated Plan for fiscal years 2015-2019, the County recognized

---

[6] County of Orange, County Executive Office, *An Assessment of Homeless Services in Orange County* at 42 (Oct. 18, 2016).
[7] *Id.*
[8] California State Auditor, *The State Could Better Ensure the Effective Use of Mental Health Services Act Funding*, Report 2017-117 at 46, Table A (2018); Jordan Graham, *Santa Ana riverbed homeless to get toilets, showers while supervisors work on plan to move them out*, Orange County Register (June 6, 2017) (reporting that the County has over $250 million in unspent Mental Health Services Act funding).  On January 9, 2018, the County Board of Supervisors directed the Orange County Health Care Agency to use $15 million of available unspent Mental Health Services Act funds to house chronically homeless individuals with severe mental illnesses.  The directive will be brought back to the Board of Supervisors in spring of 2018 for final approval.

that "[m]ost chronically homeless people have a disability that requires significant and costly support."[9]  Thus, the County's Mental Health Services Act fund includes monies earmarked for permanent housing units tied to supportive services for the chronically homeless.

41.   The County also leads the Continuum of Care ("CoC"), a regional system to coordinate housing and supportive services, and is responsible for allocating regional HUD monies to the 34 cities in its jurisdiction.[10]  As part of its evaluation for the CoC, the County identified services and housing for homeless individuals as a high priority.

42.   Despite its vast funding reserves from federal and state grants, the County has historically lacked the political will to implement the services identified as long-term solutions to solve homelessness, such as affordable housing and supportive services. This failure has had severe financial repercussions for the County.  According to a 2017 study, the County, local municipalities, and other service providers spent nearly $300 million on the homeless population in the 12-month period encompassing 2014 / 2015, including $121 million on health care and emergency services.[11]  The study concluded that the costs of homelessness to the County and other service providers actually *decline* when the homeless are housed.  For example, the study concluded that

---

[9] *Access of Strengths and Gaps in the Institutional Delivery System*, County of Orange, Consolidated Plan FY 2015-2019 at 97.

[10] *Id.*; *An Assessment of Homeless Services in Orange County* at 9.

[11] D. Snow, R. Goldberg, *Homelessness in Orange County: The Costs to Our Community* at 7 (2017).

"[a]s a result of decreases in service utilization and criminal justice contacts, the estimated average annual cost of services is 40% lower for the chronically homeless in permanent supportive housing ($51,587) in comparison to the chronically homeless living on the streets and in emergency shelters ($85,631), even taking into consideration the program costs of permanent supportive housing."[12]

## THE COUNTY'S EMERGENCY SHELTERS

43.     Emergency shelters are defined as "any facility with overnight sleeping accommodations, the primary temporary shelter for the homeless in general or for specific populations of the homeless."[13]  By design, emergency shelters are not intended for long-term stays.

44.     The County has two emergency winter shelters: the Fullerton Armory, with 237 beds, and the Santa Ana Armory, with 200 beds (collectively, the "Armories").  For the 2017-2018 season, the Santa Ana Armory is open from approximately November 2017 to April 2018.  The Fullerton Armory is open from approximately December 2017 to April 2018.

45.     Upon information and belief, the Armories are only open between the hours of 7 p.m. and 6 a.m. and do not guarantee availability the following night.  The bedding at the Armories consists of a thin mat on the floor, which is inaccessible for most people

---

[12] *Id.* at 26.
[13] 24 C.F.R. § 91.5 Subpart A, Definitions.

with disabilities.  The Armories do not allow couples to stay together, do not allow support animals, and limit possessions to small bags of belongings without a storage option for other property.  Additionally, the Armories only accept people who are able to come and go during set hours.  For people who work, who need to attend court, or who meet with service providers, the restricted hours impose an additional hurdle to staying at the Armories.

46.     The County also runs the Kraemer shelter in Anaheim, California.  Until recently, Kraemer had 100 beds that could only be accessed through a referral from a social service provider.  Individuals sleep together in stacked bunk beds.  Kraemer does not allow couples to sleep together, does not allow support animals, and limits the amount of property one can bring in.  There is also a maximum stay, after which many individuals are returned to the streets.

47.     The Courtyard, also run by the County, is a converted open-air bus terminal that was approved for 200-250 people, but that now houses over 400 people every night lying side by side on cots.  The Courtyard is currently at double capacity, making it overcrowded, loud, unsanitary, and dangerous.  The Courtyard is not near any other shelters, so people who are turned away from the Courtyard typically have no choice but to sleep outside, subjected to intense anti-camping and excessive property enforcement by Santa Ana police.[14]

---

[14] Santa Ana Municipal Ordinance §§ 10-550, 10-551.

48.     In addition to the County-run shelters, the Salvation Army runs the Hospitality

House in Santa Ana with 25 beds for transitional housing and 25 beds for emergency

shelter—all of which are reserved for men.  Service animals are only permitted if they

have federal paperwork; no support animals are permitted.  A requirement of staying in

the Hospitality House is attendance at a meeting before dinner during which a religious

service with prayer is held.  The Hospitality House is typically at capacity every night.

49.     Colette's House, another private shelter, is open only to women and children.

Residents are required to participate in a six-month transitional program, which

includes finding a job and working 32 hours per week.  No animals are allowed.

Colette's House is usually at capacity.

## PLAINTIFFS HAD NO REASONABLE
## ALTERNATIVE BUT TO LIVE AT THE RIVERBED

50.     Sheltering oneself is a basic human need and it is harmless to others.

51.     There is a strong correlation between disability, trauma, and homelessness.

Research shows that childhood trauma, including child abuse, can "rewire" the

developing brain, producing changes in both brain function and structure, and resulting

in mental health conditions such as depression, aggressiveness, anxiety, memory

problems, posttraumatic stress disorder, and attention deficit hyperactivity disorder

(ADHD).[15]  According to one study, 92% of homeless women surveyed experienced severe physical and / or sexual assault at some point in their lives—60% of whom experienced the assault by the age of 12.[16]  As a result of the trauma they experienced early in their lives, these individuals often develop one or more mental health disabilities.

52.     There is also a strong link between disability, unemployment, and poverty. According to statistics from the Employment and Disability Institute at Cornell University, 26.6% of non-institutionalized persons aged 21 to 64 years with a disability in the United States were living below the poverty line in 2016, while 77% were employed less than full-time.[17]  In contrast, only 10.9% of non-disabled people in the U.S. live below the poverty line.[18]  In short, people with disabilities are more than twice as likely to face poverty than people without disabilities.

---

[15] Health Care for the Homeless Clinicians' Network, National Health Care for the Homeless Council, *Homelessness & Family Trauma: The Case for Early Intervention* at 2 (2003).

[16] A. Browne, SS. Bassuk, *Intimate Violence in the Lives of Homeless and Poor Housed Women: Prevalence and Patterns in an Ethnically Diverse Sample*, Am. J. Orthopsychiatry 67(2): 261–278 (1997); Health Care for the Homeless Clinicians' Network, National Health Care for the Homeless Council, *Trauma and Homelessness* at 1 (1999).

[17] W. Erickson, C. Lee, S. von Schrader, *Disability Statistics from the American Community Survey*, Cornell University (2017) *available at* www.disabilitystatistics.org.

[18] *Id.*

53.     Plaintiffs' poverty and homelessness are a direct practical result of their disabilities.  All of the individual Plaintiffs suffered intense trauma during their lives, often during childhood, and all of them suffer from mental health conditions as adults. Plaintiffs' mental health conditions cause them to experience intense depression, fear, anxiety, paranoia, memory loss, and flashbacks to traumatic experiences.  In turn, these trauma-based mental health disabilities prevent Plaintiffs from being able to maintain stable interpersonal relationships or to hold the kind of job that would allow them to afford Orange County's rents, ultimately leading to their homelessness.

54.     As a result of their disabilities, temporary or transitional shelters are functionally unavailable to Plaintiffs and others like them because those types of living arrangements are temporary and are more likely to aggravate their mental health and / or physical conditions than to help.  The shelters and transitional housing programs in Orange County have an overcrowded congregate living environment, are noisy, have a complete lack of privacy, often prohibit lying down or remaining at the shelter during the day, present an increased risk of infection, and may have strong odors from smoke and chemical cleaning products that can aggravate respiratory disabilities.  Most shelters do not accept emotional support animals and do not permit couples to sleep together, thereby separating family members and emotional support companions and causing additional trauma.  In addition, the staff at County shelters are not trained to

accommodate people experiencing disabilities, particularly mental disabilities.[19] Plaintiffs are psychologically triggered and re-traumatized when they spend time in shelters.

55.    Shelters and transitional housing are also not appropriate for Plaintiffs and others with similar disabilities because these shelters are not meant for long-term occupancy and only offer temporary housing for those fortunate enough to get a bed. As the homeless population in Orange County has grown, transitional housing providers have no choice but to turn many people away, or to return people to the street once they reach a shelter's maximum stay.[20]  This practice perpetuates the cycle of instability homeless individuals experience as they move from street to shelter to street, or from shelter to shelter.  Even those individuals who are able to access the shelter system are often condemned to spending at least some time on the streets, with all the associated health and safety risks, given the strict time limits placed on shelters. For many people with disabilities, including Plaintiffs, this constant upheaval aggravates their disabilities, causing re-traumatization and deterioration of their health.

---

[19] *See, e.g., County's 'Courtyard' Homeless Shelter Gets Mixed Reviews*, Voice of OC (Nov. 29, 2016), *available at https://voiceofoc.org/2016/11/countys-courtyard-homeless-shelter-gets-mixed-reviews/.*

[20] *Housing Shortage Sent Homeless at Transitional Shelter Back to Streets*, Voice of OC (Nov. 22, 2017), *available at* https://voiceofoc.org/2017/11/housing-shortage-sent-homeless-at-transitional-shelter-back-to-streets/(homeless individuals returned to the streets after reaching maximum stay)

56.     Even if shelters were accessible to Plaintiffs and other homeless individuals with disabilities, there are not enough shelter beds in the County to accommodate the County's unsheltered homeless population.  Upon information and belief, all of the County's shelters are currently near or at capacity.  There are currently hundreds more unsheltered homeless people than available emergency shelter beds, even when accounting for seasonal and overflow spaces.[21]

57.     Unable to use the County's transitional housing due to their disabilities, Plaintiffs have no alternative to living on the streets.  Plaintiffs moved to the Riverbed as a last resort, seeking refuge from frequent harassment by local police.  All of the Plaintiffs have been harassed, cited, arrested, or had their property seized by local police for unavoidable and harmless activities, causing them to have a deep distrust of people in uniform.  Although living at the Riverbed was not ideal, it accommodated Plaintiffs' disabilities better than living in a temporary shelter or on the streets of Orange County because it provided Plaintiffs with autonomy, stability, and control of their personal space, which are crucial to helping Plaintiffs manage their disabilities.  For Plaintiffs and hundreds of others like them, moving to the relative stability of the Riverbed was their only option.

---

[21] *See An Assessment of Homeless Services in Orange County* 6 at 7, 22-23.

## THE COUNTY'S PROGRAM TO RELOCATE HOMELESS INDIVIDUALS TO APPROPRIATE HOUSING, INCLUDING PERMANENT HOUSING

58.    Since approximately 2016, the County has undertaken efforts to integrate its homeless resources and build out its capacity to provide housing solutions and supportive services to the County's homeless population.

59.    In 2016, the County hired a Director of Care Coordination to coordinate the County's efforts to address homelessness.  On October 18, 2016, the County published *An Assessment of Homeless Services in Orange County*, which recommended strategies for meeting the immediate basic needs of homeless people and for leveraging the County's resources to increase permanent housing solutions.[22]

60.    On June 6, 2017, the Orange County Board of Supervisors approved $750,000 to enter into a contract with a homeless outreach organization to facilitate enhanced provision of services and housing to Riverbed residents.  The ultimate goal was to engage and relocate Riverbed residents to appropriate housing solutions.  The County stated that these services would be available to any individual willing to accept the County's help.

61.    On June 27, 2017, the Orange County Board of Supervisors approved funding to expand the County's "Whole Person Care" services to include additional recuperative care for the County's homeless population.  In a press release announcing the

---

[22] *Id.* at 8.

expansion, the County stated that, "[w]orking with the homeless population in a holistic way that addresses health, addiction, job re-entry and mental health services will provide relief to emergency rooms in ways we haven't seen before."  As part of the expansion, the County will receive an increase in matching federal dollars, with total spending reaching $31,066,860.

62.     Also on June 27, 2017, the Orange County Board of Supervisors approved the County's Mental Health Services Act Three Year Plan for fiscal years 2017 / 2018 to 2019 / 2020, which expands funding for mental health housing and wrap-around services, including to the County's homeless population.

63.     On July 1, 2017, the County Executive Office submitted a memorandum to the Board of Supervisors regarding the Fiscal Year 2017-18 Annual Budget.  The memorandum stated that the County's annual budget of $6.2 billion would be allocated to fund the County's strategic priorities, including a "Building a System of Care" initiative intended to respond to homelessness across the region by engaging all 34 of the County's cities.  The System of Care includes the Whole Person Care initiative, expansion of shelter capacity, and a Housing Initiative to "renew critical resources" for homeless housing and services countywide, including for permanent supportive housing. The County received an additional award of $22 million to fund the Housing Initiative.[23]

---

[23] County of Orange, Annual Budget FY 2017-2018 at 11.

64.     To fulfill the Program's goals, on or about July 1, 2017, the County entered into a contract with City Net, a nonprofit service provider, that would provide triage operations, intensive case management, and links to both transitional and permanent supportive housing.

65.     On the County's behalf, County personnel, including the County Health Care Agency ("HCA") Behavioral Health Outreach and Engagement unit, and City Net would "conduct a daily coordinated campaign of outreach efforts in order to provide comprehensive resources to serve the homeless population at the Riverbed," including "facilitating verifiable street exits from the focus area." [24]  Consistent with the County's Ten-Year Plan to End Homelessness, which committed the County to prioritize the "creation of affordable permanent housing, permanent supportive housing and permanent housing with support services," the County stated that it would utilize "new and existing resources" throughout the County in order to "assist homeless neighbors onto a path that leads towards permanent housing stability."[25]

66.     On July 10, 2017, the County issued a press release regarding implementation of the Program in the Riverbed.  The press release explained that the County would "leverage existing Permanent Supportive Housing grants through Continuum of Care funding to provide access to permanent housing options for the individuals encamped

---

[24] City Net, Flood Control Channel, *available at* http://citynet.org/flood-control-channel/.
[25] *Id.*

along the flood control channel."[26]  The County Board of Supervisors also directed HCA to include $5 million in funding from the Mental Health Services Act, directed towards permanent supportive housing solutions.

67.     The County stated that its goal was to "engage all individuals encamped in the area with case management activities and coordinate 10-15 connections to housing resources per month through collaborative case management."[27]  Supervisor Lisa Bartlett recognized that "[c]hronically homeless individuals with disabilities who lack stable housing often do not receive the appropriate preventative care or supportive services."[28]

68.     In July and August of 2017, City Net, on the County's behalf, conducted a census of the homeless population at the Riverbed in order to better understand the services needed.  The census results showed that over 51% of homeless residents surveyed reported having a disability, over 42% had mental health concerns, and 37.5% were victims of domestic violence.  Over 70% of those surveyed reported being homeless for over one year.  Additionally, 81% of those surveyed stated they are interested in case management.

---

[26] County Executive Office, *County Partners with City Net for Santa Ana River Flood Control Channel Homeless Engagement Initiative* (Jul. 10, 2017).
[27] *Id.*
[28] Bartlett, Lisa, *Housing is a hand up not a hand out*, OC Register (Dec. 2, 2017) *available at* https://www.ocregister.com/2017/12/02/housing-is-a-hand-up-not-a-hand-out/.

69.     Once the census was completed, the County began a massive outreach to Riverbed residents, offering residents an individualized needs assessment followed by offer of placement in service programs and housing.  This outreach effort was conducted by three County agencies: HCA, City Net, and the Orange County Sheriff, with support from the Anaheim and Orange Police Departments.

70.     City Net was tasked with conducting a personalized assessment of each Riverbed resident.  Upon information and belief, City Net relied in part on the Vulnerability Index—Service Prioritization Decision Assistance Tool ("VI-SPDAT"), a questionnaire designed to identify individual needs and match them with appropriate housing and services, including emergency shelters, transitional housing, and permanent housing.  The VI-SPDAT produces a numerical score that City Net uses to prioritize the most vulnerable individuals.  Individuals with high VI-SPDAT scores became eligible for available Permanent Supportive Housing ("PSH"), a program designed to provide housing and supportive services on a long-term basis to chronically homeless people.  Individuals with lower scores may be offered temporary housing assistance, such as emergency shelters, transitional housing, recuperative care beds, or Rapid Re-Housing ("RRH"), which is designed to move people quickly out of homelessness and into housing.  City Net or County personnel were tasked with assisting individuals to make arrangements and fill out the necessary paperwork for placement in the relevant housing program.

34

71.     In September 2017, the Orange County Sheriff, accompanied by police officers from local police departments, conducted over 1,000 outreach contacts to individuals living at the Riverbed.  Large groups of armed officers in full uniform would surround Riverbed residents at their tents, often calling into the person's tent and informing them that the Sheriff wanted to speak to them.  When the person came out, officers asked a series of questions, which the officers said would allow residents to access services.  Officers asked residents for personal information and noted that information on Sheriff Department field survey cards.  Simultaneously, law enforcement was running a program to check each individual for active warrants and criminal activity.  Not surprisingly, the Sheriff reported that, out of over 1,000 field surveys, 910 people declined services.

72.     Finally, HCA staff, including "Mental Health Specialists" with HCA's Behavioral Health Outreach and Engagement unit, conducted outreach and assessments of Riverbed residents in order to connect them to appropriate services and housing.  Although HCA staff has acknowledged the importance of building trust and rapport with homeless individuals experiencing disabilities, upon information and belief, HCA's assessment involves a brief 20-30 minute interview by HCA staff who are wearing uniforms provided by the County and who are often accompanied by the Orange County Sheriff or other law enforcement.  Upon information and belief, the HCA staff members conducting the assessments do not have the training appropriate to

identify people with disabilities in the field, and HCA does not use any formalized questionnaire or other tool developed to identify and accommodate people with disabilities in the field.  HCA's assessment itself contains few, if any, questions relating to mental and physical disabilities and does not include any review of an individual's medical history, including the review of medical records, opinions from doctors, or psychological evaluations.  Most often, the interaction between HCA staff and a homeless individual consists of nothing more than HCA's offer of a ride to the Courtyard.  If the individual expresses doubt or an inability to use shelters, HCA staff identifies the individual as "refusing services."

73.     Although the County knew that a majority of Riverbed residents have disabilities, the County did not attempt to evaluate the immediate needs of people with disabilities or to accommodate their disabilities during the assessments.  The County encouraged people with disabilities to go to shelters without regard for whether the shelter was disability appropriate for the person, even though the County was aware of shelter conditions and even though the County has ample resources to facilitate permanent supportive housing, Shelter Plus Care, or Section 8 housing for those who cannot utilize the shelters.

74.     In December 2017, the Board of Supervisors extended the City Net contract for another six-month period, from January 1, 2018, to June 30, 2018.  In December 2017, Carrie Braun, the County's public information manager, stated that, "[t]hese are

vulnerable individuals who need services.  The county needs to balance the needs of the housed and the unhoused.  With the sheer enormity of the situation and hundreds of individuals, it's going to take time to do it correctly."[29]  As of January 19, 2018, 171 individuals had participated in the County's Program and were receiving case management, but had not yet received appropriate housing.

### THE COUNTY ABRUPTLY BEGINS A MASS EVICTION OF THE RIVERBED ENCAMPMENTS, EVEN THOUGH HUNDREDS OF PEOPLE, MANY OF THEM WITH DISABILITIES, HAD NOT YET BEEN ABLE TO ACCESS THE PROGRAM

75.    Political pressure to remove the homeless encampments along the Riverbed began to dramatically increase toward the end of 2017.  In August 2017, over 11,000 people signed a petition calling on the County to remove the Riverbed residents.  In September 2017, the City of Anaheim declared a "state of emergency" with respect to the Riverbed, increasing pressure on the County to clear the Riverbed's encampments and to permit Anaheim police to conduct patrols along the Riverbed.

76.    In the face of mounting political pressure, on or about January 3, 2018, the County announced plans to evict all homeless individuals from the Riverbed.  The County announced the eviction even though an estimated 700 people or more still remained at the Riverbed, many of whom experienced disabilities and who had not yet

---

[29] David Whiting, *Fear, loathing and hope for homeless on the Santa Ana River Trail*, Orange County Register (Dec. 8, 2017) *available at* https://www.ocregister.com/2017/12/08/fear-loathing-and-hope-for-homeless-on-the-santa-ana-river-trail/.

been able to access the Program or any housing solutions that would accommodate their disabilities.

77.     In a January 3, 2018 Memorandum from the Orange County Executive Office, issued in conjunction with the announced eviction, the County stated that "the County will be on-site during this transition to provide necessary services to connect those who wish to accept the help with the teams that can provide it." [30]  However, the County stated that the only housing that would be offered during the eviction is "the Courtyard in Santa Ana and at Bridges at Kraemer Place in Anaheim as appropriate."[31]  Neither is "appropriate" for Plaintiffs with their disabilities.

78.     On January 8, 2018, the County posted Work Notices along the Riverbed, giving residents two weeks to vacate the Riverbed.  The Work Notices stated that individuals who remain on or return to the Riverbed after January 22, 2018 will be prosecuted under California law, including Penal Code §§ 370, 372, 602 and 555 *et seq.*

79.     Surrounding cities, including Orange and Anaheim, publicly stated that homeless people being evicted from the Riverbed would not be permitted to move into their jurisdictions.[32]

---

[30] January 3, 2018 Memorandum of Frank Kim, County Executive Officer, to County Board of Supervisors Chairwoman Michelle Steel re Orange County Flood Control District; Santa Ana Riverbed Encampments (hereinafter, "January 3, 2018 Memo").
[31] *Id.*
[32] Jordan Graham, *Orange County is ready to clear out the Santa Ana riverbed homeless encampment. But where – and exactly when – will they go?*, Orange County Register (Jan. 21, 2018) *available at* https://www.ocregister.com/2018/01/21/orange-

## **PLAINTIFFS REQUEST A REASONABLE MODIFICATION OF THE PROGRAM, BUT THE COUNTY DENIES THEIR REQUESTS**

80.     As of the date the eviction was announced, only Plaintiffs MacArthur, Sweat, and Ives had been contacted by the County to participate in the Program.  However, the County failed to accommodate their disabilities or to connect them with disability appropriate housing options.  None of the other Plaintiffs had been assessed or connected to services that would accommodate their disabilities.

81.     Between January 12 and January 22, 2018, each of the Plaintiffs submitted a reasonable modification request to the County pursuant to the ADA (collectively, the "Requests").  Each Plaintiff informed the County that he or she has a disability under the ADA and that, because of that disability, is unable to participate in the Program in a way that provides access equal to that of non-disabled individuals.  Further, each Plaintiff requested that, as a reasonable modification to the Program, the County modify the Program to permit him or her to equally participate, and that he or she be permitted to remain at the Riverbed until the County connects him or her to housing that accommodates his or her disability.

82.     In response to Plaintiffs' Requests, and although Plaintiffs explained that they were requesting an accommodation to the assessment itself, the County stated that Plaintiffs' only option is to undergo an assessment with HCA staff.

---

county-is-ready-to-clear-out-the-santa-ana-riverbed-homeless-encampment-but-where-and-exactly-when-will-they-go/.

83.     On January 30, 2018, Plaintiffs Ramirez, Sweat, Saint Vincent, Gray, and Teasley underwent the assessment with HCA staff.  Although Plaintiffs had submitted the Requests notifying the County of their disabilities, HCA staff made no attempt to accommodate or even address those disabilities during the assessments.  In addition, although Plaintiffs informed the County that shelters and transitional housing were not appropriate for their disabilities, the first and often the only option the County offered Plaintiffs was shelters.

84.     Sharon Sweat's assessment was conducted on the public bike trail in front of her tent by two HCA staff members.  Throughout the entire assessment, Sweat and HCA staff stood while officers from the Orange County Sheriff and Orange Police Department patrolled the area around Sweat's tent on foot and in squad cars.  Although the HCA staff members had no previous interactions with Sweat, and although Sweat stated that she had been a victim of assault the night before, HCA staff made no attempt to build rapport with her, gain her trust, or to make her feel comfortable by taking her to a more private space.

85.     The first question HCA asked was "what can we do for you today."  When Sweat said she did not know how to answer that, HCA staff immediately asked if she would go to an emergency shelter.  HCA staff did not explain that the Courtyard housed over 400 people with no privacy whatsoever despite the fact that Sweat, visibly shaken, stated that she was "overwhelmed," and that she did not "play well with

40

others."  Although Sweat had submitted a Request explaining that she had lived at the Riverbed for 14 years and that she was unable to go to a temporary shelter due to her disabilities, HCA staff did not ask about her concerns regarding shelter residence and made no attempt to ask whether a shelter would be disability appropriate for her. Instead, HCA pushed Sweat to go to the Courtyard the very next day.  When Sweat stated, "I can't do this this right now," HCA staff asked if she was "refusing services." The assessment triggered Sweat's mental illness symptoms and made her feel out of options, threatened, and re-traumatized.  Ultimately, the only accommodation HCA offered was to give her an extra day to pack before taking her to the Courtyard.

86.    After the assessment, Sweat learned from former Courtyard occupants about the crowded conditions at the shelter and determined that it would aggravate her mental health conditions.  Sweat informed the County that she could not go to the Courtyard and requested information about housing that would accommodate her disabilities. The County did not respond.

87.    All of the Plaintiffs had similar experiences and have been unable to access the County's Program due to their disabilities.  In the face of the County's refusal to modify the Program to accommodate their disabilities, Plaintiffs had no choice but to file this lawsuit.

**THE COUNTY RELOCATES OVER 700 PEOPLE FROM THE RIVERBED TO MOTELS AND SHELTERS WITHOUT APPROPRIATE MODIFICATIONS TO ACCOMMODATE PEOPLE WITH DISABILITIES**

**A.     Within a Period of Ten Days, the County Relocates Over 700 People from the Riverbed to Motels and Shelters as Part of the Program.**

88.     On February 7, 2018, Plaintiffs filed their initial Complaint against the County, alleging that the County's Program discriminates against homeless people with disabilities under the ADA and violates homeless individuals' rights under state and federal law.  Case No. 8:18-cv-00220-DOC-KES, Dkt. # 1.

89.     On February 13, 2018, the County entered into a Stipulation in *Orange County Catholic Worker, et al. v. County of Orange, et al.*, Case No. 8:18-cv-00155-DOC-KES (the "Stipulation").  Case No. 8:18-cv-00155-DOC-KES, Dkt. #92.  The Stipulation modified the County's Program so that homeless residents living at the Riverbed would be relocated to motels or shelters while the County continues to implement the Program.  Plaintiffs were not party to the Stipulation.

90.     Specifically, the Stipulation provides that the County shall provide motel rooms to all individuals living along the Riverbed for a minimum of 30 days while the County completes a "clinical assessment" of each individual's "needs and appropriate resources, including shelter, housing and other supportive services."  The Stipulation provides that at the conclusion of the 30-day period, "appropriate resources" would be provided.  The Stipulation also states that the County shall continue to provide services to individuals who have relocated to motels, including food, health, and transportation

services, and that the County shall store the personal property of homeless individuals

relocating to motels for 90 days.

91.    On or around February 14, 2018, the County began relocating the homeless

population living at the Riverbed under the Program.  Over the next ten days, the

County moved approximately 719 people from the Riverbed to motels or shelters

spread throughout Orange County.

**B.    Plaintiffs Submit Additional Reasonable Modification Requests to the
County Regarding their Relocation under the Program.**

92.    On February 15 and February 16, 2018, Plaintiffs submitted additional

reasonable modification requests to the County pursuant to the ADA.  Plaintiffs'

February 2018 requests continued to assert Plaintiffs' need for a reasonable

modification of the Program based on their disabilities and made several modification

requests specific to their relocation to motels, including that they be placed together in

motels near the Riverbed, that they be provided with information about the clinical

assessments they would be required to undergo, and that they be permitted time to

consult with legal counsel.

93.    Plaintiffs also requested that the County implement procedures to allow disabled

individuals to make modification requests with regard to the Program, and reiterated

that the Program, as modified by the Stipulation, continued to discriminate against

people with disabilities.

94.    The County did not respond to Plaintiffs' requests.

43

**C.     The County Relocates Plaintiffs to Motels without Accommodating Plaintiffs' Disabilities.**

95.     Between February 15 and February 20, 2018, the County relocated Plaintiffs to various motels in cities around Orange County, including Anaheim, Stanton, Tustin, and Westminster.

96.     Although Plaintiffs had requested, as a reasonable modification under the ADA, that they be permitted time to consult legal counsel, the County demanded that Plaintiffs make on-the-spot decisions regarding the County's offer of motel housing and services, even though they were not provided with sufficient information to fully understand what was being offered.  Some individuals, including Ramirez, were warned that if the County's offer was not accepted immediately, the individual would lose the opportunity for services or housing altogether.  Intimidated by this process, Plaintiffs and other disabled homeless individuals felt pressured to submit to the County's Program without information about the services offered and without understanding whether the services would accommodate their disabilities.

97.     The County instructed Plaintiffs and other homeless individuals to immediately board County vans and buses to various motels around the County.  Plaintiffs were not given any advance notice informing them of what motel they would be taken to, how long they would be housed there, how to access food, transportation, and other basic necessities in the new area, who to call for help, or when the clinical assessments would be conducted.

98.     County staff told Plaintiffs and others that they were only permitted to take two

small bags with them to the motels and that they must leave their remaining property

on the Riverbed.  County staff told Plaintiffs that they could return to the Riverbed

later to collect their remaining property.  However, once the County began the

relocation process, it immediately posted signs at the entrance to the Riverbed stating

that the Riverbed was closed and that trespassers would be prosecuted.  Sheriff

Deputies posted at the entrance to the Riverbed and refused entry to homeless

individuals.

99.     When Plaintiffs and other disabled homeless individuals arrived at their motels,

they found that all amenities had been removed, including the telephone, refrigerator,

comforter, television, hair dryer, ice buckets, and shower curtain.  Upon information

and belief, the County entered into a six-month $1.68 million contract with the motel

to rent 99 rooms and agreed to the removal of room amenities.  The contract also

provided that the motel would drain the pool and jacuzzi and bar homeless individuals'

access to the pool area and the on-site gym unless the county requested otherwise.[33]

As a result of the County's actions, Plaintiffs' and others' health and safety were put at

risk because they had no way to call for help if they needed food or transportation, or

---

[33] Walker, Theresa, *What happens when homeless people are sent to motels? Some are welcomed, some treated warily, some kicked out*, OC Register (Feb. 27, 2018), available at https://www.ocregister.com/2018/02/27/what-happens-when-homeless-people-are-sent-to-motels-some-are-welcomed-some-treated-warily-some-kicked-out/

even to call 9-1-1 if they were having a medical emergency.  Plaintiffs and others also had no way to store perishable food items and had no access to news or other media to stay informed.

100.   As a result of the County's actions, Plaintiffs and others like them felt isolated, abandoned, and destabilized, all of which triggered their mental health symptoms and caused them to feel extreme anxiety, stress, uncertainty, paranoia, and depression.

101.   On February 17, 2018, Plaintiffs filed a Notice Re: Issues Relating to Implementation of the Stipulation.  In the Notice, Plaintiffs identified a number of issues impacting people with disabilities, including: a failure to put procedures in place for requesting modifications under the ADA; a failure to provide habitable conditions at the motels; a failure to provide accommodations in proximity to medical, food, and community resources; a failure to provide information to enable informed decision-making; a failure to permit victims of trauma to remain together;  and a failure to accommodate requests to consult with counsel.

102.   On February 20, 2018, Plaintiffs filed a second Notice regarding ongoing issues with the County's relocation of homeless individuals, including: a failure to provide basic necessities such as a telephone; a failure to provide basic information to permit informed decision-making; a failure to accommodate the needs victims of trauma; a failure to permit people to retain personal property when relocating; and a failure to prevent the premature eviction of homeless individuals from some of the motels.

**D.     The County Abruptly Terminates Plaintiff Ramirez's Motel Benefits, Leaving Ramirez to Spend the Night on the Street without Protection.**

103.   On February 22, 2018, Plaintiff Ramirez was informed by Motel 6 management that he was being evicted that same day and that he must check out immediately. Ramirez immediately contacted the County, informed the County that he had nowhere to go, and asked to be placed in another motel.  Although the County said it would investigate, the County failed to provide Ramirez with another motel room on February 22, 2018.

104.   Unable to arrange alternative accommodations on such short notice, and unable to return to his camp at the Riverbed, Ramirez had no choice but to sleep on the sidewalk on February 22, 2018.  Because the County had instructed Ramirez to leave his tent, warm clothes and blankets at the Riverbed when the County required him to relocate, Ramirez was forced to sleep on the sidewalk without a blanket, tent, or his warm clothes.

105.   Upon information and belief, the nighttime temperature on February 22, 2018 dropped to the mid-40s, putting Ramirez at risk of hypothermia and other illnesses caused by exposure to cold temperatures.  The stress caused by his sudden eviction from Motel 6 and by being forced to sleep on the streets without any protection from the cold exacerbated Ramirez's disabilities and caused him extreme emotional distress.

106.   On February 23, 2018, Ramirez again contacted the County and requested that he be placed in another motel.  Although the County had been on notice since at least

November 2017 that Ramirez suffered from mental health disabilities, and although Ramirez had submitted several reasonable modification requests to the County under the ADA, the County responded that Ramirez had been evicted for "behavioral issues" and that, pursuant to County policy, Ramirez was therefore not eligible for additional nights in a motel.  However, the County stated that it would make an exception to its policy in Ramirez's case and attempt to place him in another motel.

107.   The County did not give Ramirez any notice that his behavior at the motel was problematic and did not give him any opportunity to be heard before the County terminated his motel benefits on February 22, 2018.  Further, despite Ramirez's repeated requests for more information after his eviction, the County refused to provide Ramirez with information about what specific behavior had caused the County to terminate his benefits or what type of behavior would result in a termination of benefits in the future.  As a result, Ramirez lacks information necessary to permit him to conform his behavior to meet the County's standards.

108.   Ramirez's eviction and his resulting injuries were caused by the County's policy of terminating individuals the County deems to have "behavioral issues."  Upon information and belief, the County's termination of Ramirez was part of a pattern and practice of terminating the motel benefits of homeless individuals when the County determines that those individuals' behavior does not conform to County standards. Upon information and belief, the County has not provided homeless individuals with

information about what constitutes "behavioral issues" that will result in the

termination of the motel placement.

**E.    The County Continues to Deny or Ignore Plaintiffs' Reasonable Modification Requests.**

109.   On February 23, 2018, Plaintiffs submitted another letter to the County

requesting, as a reasonable modification of the County's Program, that the County

provide Plaintiffs with information about the clinical assessments, including the time

and date of the assessment, how the assessment differs from the assessment Plaintiffs

already underwent, and information about how to request a reasonable modification of

the assessment.

110.   In addition, Plaintiffs requested that their legal counsel be notified before the

assessment, that their counsel be provided with copies of the assessment, and that they

be permitted time to consult with counsel about housing options.  Plaintiffs made the

request based on their disabilities and requested that the County contact Plaintiffs'

attorneys to discuss resolution of the issues.  The County did not respond to Plaintiffs'

requests and has repeatedly failed to notify Plaintiffs' counsel of County contacts with

Plaintiffs.  As a result, Plaintiffs have been required to participate in the Program

without the ability to access and consult with their legal counsel.

111.   On February 27, 2018, Plaintiffs submitted a letter to the County Board of

Supervisors regarding the ongoing issues relating to the County's relocation of

Plaintiffs and other homeless residents from the Riverbed.  Plaintiffs enclosed the two

Notices filed with the Court on February 17 and February 20, 2018.

112.   On February 28, 2018, Plaintiffs submitted another letter to the County

requesting, as a reasonable modification of the Program, that the County work with

Plaintiffs to resolve the ongoing issues relating to their motel stays, including their lack

of food, transportation, telephones, and access to health services.  Plaintiffs made the

request based on their disabilities and requested that the County contact Plaintiffs'

attorneys to discuss resolution of the issues.  Per the County's request, Plaintiffs

provided the County with specific details about the issues at the motels, including each

individual's name, motel, and specific issues.  However, the County failed to

adequately respond to Plaintiffs' request.

113.   On or about March 16, 2018, the County began terminating homeless

individuals' motel vouchers.  Although the County knew that the majority of those

individuals experienced one or more disabilities, the County failed to provide disability

appropriate housing to Plaintiffs and others at the end of their motel stays.  Instead,

County workers simply posted notices on individual motel rooms stating the date that

each person's motel placement would end and providing that individual with a phone

number to call and inquire about shelters.  Many people, including Plaintiffs, received

the termination notice less than 48 hours before the motel placement expired.  Once

again, Plaintiffs' counsel was not notified of the County's plans for Plaintiffs.  To date,

the County has not changed its Program and related policies and Plaintiffs have continued to seek access to the Program.

**F.    The County Unlawfully Seizes and Destroys Plaintiffs' Property.**

114.    During the relocation process, Plaintiffs relied on statements made by County agents that they would be able to return to the Riverbed to collect their property. However, when Plaintiff Ramirez attempted to return to the Riverbed to collect his belongings, his property was no longer there.  Others, including Plaintiffs were placed in motels miles away from the Riverbed without access to transportation and were therefore unable to return to the Riverbed to collect their belongings.  As a result, Plaintiffs and others lost essential personal property, including medication, medical equipment, clothing, shoes, bicycles, and blankets.

115.    These items permit Plaintiffs to survive on the streets, particularly in the winter months.  Given the short-term nature of their motel stays, Plaintiffs are terrified of being forced to return to the streets without their essential life items.  Plaintiff Ramirez's life was put in jeopardy when he was evicted from his motel without access to blankets or warm clothing.

116.    Upon information and belief, the County, through its agents and employees, seized and destroyed Plaintiffs' and other homeless individuals' property or failed to adequately inventory and store Plaintiffs' and others' property.  Although the County stated that it would provide storage to homeless individuals leaving the Riverbed, upon

information and belief, it was the County's policy, custom, or practice during the relocation process to deem homeless individuals' property as abandoned if the individual was not present with the property when the County agents arrived, and to treat the property as garbage.

117.   The County knew or should have known that Plaintiffs and others only left their property at the Riverbed at the County's direction and did not intend to abandon the property.  Plaintiffs and others relied on the County's representation that they would be permitted to return to the Riverbed to collect their property.

118.   Upon information and belief, the County's process for storing property during the relocation was inadequate because the County failed to provide tags for personal property or to otherwise inventory the property stored, and failed to provide homeless individuals with information about how to reclaim the property.

**G.    The County Commits Additional Available Mental Health Services Act Money to Assist Orange County's Homeless and Mentally Ill Population.**

119.   On or about February 27, 2018, the California State Auditor released a report showing that Orange County had $241,931,000 in available Mental Health Services Act funds, which included $11,303,000 of interest earned by the County on unspent funds.[34]

---

[34] *Mental Health Services Act: The State Could Better Ensure the Effective Use of Mental Health Services Act Funding Report* at 46 (2017) https://www.bsa.ca.gov/pdfs/reports/2017-117.pdf.

120.   On or about March 1, 2018, the County entered into a contract with Telecare Corporation for the provision of Full Service Partnership Services to residents of Orange County.  The contract commits the County to spending up to $11,807,981 in Mental Health Services Act and federal Medi-Cal funding.  The General Population FSP program serves adults, age 18 to 59 years, who have severe mental illness and / or co-occurring substance use disorders, and are homeless or at risk of homelessness, unserved or underserved, or not successfully engaged in traditional mental health services.  County staff requested that the Board of Supervisors ratify the contract at the March 27, 2018 meeting.

121.   On or about March 19, 2018, the County Board of Supervisors voted to commit $70.5 million of Mental Health Services Act funds to include funding for permanent supportive housing for homeless individuals, funds that have long been available, unidentified and unutilized by the County.  County Board Chairman Andrew Do described the County's recent identification of the funds as "'willful negligence' if not intentional misrepresentation."

## THE PROGRAM DISCRIMINATES AGAINST PEOPLE WITH DISABILITIES

122.   The County knew when it began the Program that a significant percentage of its homeless population experience physical or mental disabilities, or both.  The County also knew that the majority of people living at the Riverbed were chronically homeless individuals experiencing physical or mental disabilities, or both.  The County's own

census showed that 51% of the population had a disability, that 42% had a mental

health concern, and that 37% were victims of domestic violence, a sub-population with

high occurrences of PTSD and other trauma-related mental health concerns.  In

comparison, only 8.5% of the County's total population is affected by one or more

disabilities.[35]

123.   In addition, the County has recognized that mental illness and homelessness are

"often inextricably intertwined" [36] and has concluded that "[t]he homeless population

represents a high-risk group with significant acute and chronic health conditions, co-

occurring substance abuse and / or mental health conditions."[37]  According to the

Orange County Sheriff-Coroner's Department, there were over 200 reported deaths

among the homeless population between December 2016 and December 2017.  The

County was aware that deaths of homeless people are caused primarily by untreated

health conditions, substance abuse and mental health disabling factors.[38]

124.   Although the County knew that a significant percentage of its homeless

population, including a majority of the Riverbed's homeless population, was

experiencing disabilities, the County did not attempt to make the Program accessible to

---

[35] 2012 -2016 American Community Survey 5-Year Estimates: Disability in Orange County, California.
[36] Orange County, *Mental Health Services Act Three Year Plan FY 17/18-19/20* at 10 (2017).
[37] *An Assessment of Homeless Services in Orange County* at 23.
[38] *Id.*

54

people with disabilities.  Instead, the County used state and federal funds to discriminate against people experiencing disabilities and chronic homelessness.

125.   The County's Program discriminates against homeless individuals with disabilities, including Plaintiffs, in at least three ways.  First, individuals with disabilities are denied the benefits of the Program, including disability appropriate housing, because of their disability.  Second, individuals with disabilities are required to participate in the Program assessments without any accommodation for their disability, which has a disparate negative impact on the participants' health.  Third, some individuals with disabilities are excluded from participating in the Program altogether.

**A.     People with Disabilities Are Routinely Denied the Benefits of the Program, Including Disability Appropriate Housing.**

126.   The County has discriminated against people with disabilities by pushing them into shelters that fail to accommodate, and in many cases even worsen, their disabilities.  All of the Plaintiffs were encouraged to go to shelters, even though the County knew or should have known that Plaintiffs and others like them cannot tolerate the overcrowded, noisy, congregate living environment and related problems common in all of the County's shelters.  The County knew or should have known that the temporary nature of the shelters does not provide stability, and that the shelters'

restricted access and lack of guaranteed beds creates a sense of instability and constant upheaval that exacerbates disabilities.

127.    Although, upon information and belief, the County offered long-term services and permanent housing to some residents, Plaintiffs and others like them were routinely denied access to the permanent housing benefits of the Program because of their disabilities.

128.    The County knew or should have known that people with disabilities were being denied equal access to the Program, particularly after receiving Plaintiffs' Requests for reasonable modifications under the ADA.  Despite this knowledge, the County refused to modify the Program to accommodate people with disabilities, instead choosing to characterize those remaining on the Riverbed as "service resistant" and to continue their forced eviction.

129.    The County's abrupt evictions of homeless residents discriminates against people with disabilities by forcing them to leave their only stable living environment even though they have not been afforded equal access to the Program, aggravating mental health conditions and putting their health and safety at risk.

**B.    The Program Assessments Discriminate Against People with Disabilities, Particularly Mental Health Disabilities.**

130.    According to the United States Interagency Council on Homelessness ("USICH"), composed of nineteen federal cabinet and agency heads, "intensive and persistent outreach and engagement" is required to reach the most vulnerable members

of the homeless community.  The County knew or should have known that it takes time, multiple contacts, and a validating therapeutic approach in order to make the Program accessible to homeless individuals, who disproportionately have experienced trauma and its associated mental and physical disabilities.[39]  The County's failure to tailor assessment questions, to use appropriately trained staff, and to conduct the assessments in a disability appropriate setting discriminates against people with disabilities by re-traumatizing individuals and triggering mental health symptoms.

131.   The County knew or should have known that its assessments, including the VI-SPDAT and HCA assessments, are insufficient to elicit information about a person's disability and how that disability impacts their housing needs.

132.   The VI-SPDAT does not include any medical record review, clinical evaluation, or questions tailored to accomplish a comprehensive assessment of physical or mental health conditions that would allow the County to match those individuals with disability appropriate housing.  Nor did the County use tools tailored to make the assessment accessible to people with mental health disabilities, such as beginning the assessment with validating questions or questions designed to build trust and rapport.

---

[39] E. Cronin, et al., *The Impact Of The Therapeutic Alliance On Treatment Outcome In Patients With Dissociative Disorders*, Eur. J. Psychotraumatology Vol. 5 (2014) (discussing the importance of using the "therapeutic alliance" in the provision of services to people experiencing mental health conditions related to trauma, including building rapport and being empathetic and kind during interactions).

133.   The assessment conducted by HCA is even more cursory than the VI-SPDAT. Although HCA's assessments are conducted by Mental Health Specialists, it does not include any questions about the person's background, the trauma they have experienced, the nature of their disabilities, or even whether they have ever been treated for a mental health condition.  Moreover, the County made no attempt to create a private space to conduct the assessment, for example, by setting up a tent or driving a trailer to the encampments to conduct proactive outreach and use as a mobile assessment space.  The HCA assessments conducted at the motels were conducted in hallways, parking lots, and on doorsteps.  Often, they only lasted ten or twenty minutes.

134.   As a result, the assessments discriminate against people with disabilities because it screens them out of the Program by deeming them "service resistant" or by awarding them a lower VI-SPDAT score that makes them ineligible for higher levels of housing assistance appropriate to their needs.

**C.    The Program Excludes Some People With Disabilities Entirely.**

135.   The County knew or should have known that its Program would be inaccessible to certain people experiencing disabilities because the Sheriff on joint patrols conducts many of the Program assessments with local police, including Anaheim and Orange Police Department officers.  Even when HCA conducted the assessments, HCA staff was in uniform and was often accompanied by law enforcement.

136.   The presence of law enforcement makes it unlikely that people who have experienced trauma and its associated disabilities would feel comfortable enough to be able to fully participate in the assessment and share sensitive personal information. Indeed, many people with mental health conditions report being "scared" of talking to County workers and often hide when County workers approach.  As a result, some people with disabilities are not assessed and / or are deemed "service resistant," and are thereby excluded from the Program altogether.

## CAUSES OF ACTION

### FIRST CAUSE OF ACTION
### Violation of Americans with Disabilities Act
### (42 U.S.C. § 12132; 42 U.S. Code § 12133; 29 U.S.C § 794a)

137.   Plaintiffs hereby incorporate all preceding paragraphs as if fully set forth herein.

138.   Title II of the ADA, 42 U.S.C. § 12132, provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in, or be denied the benefits of, the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity."

139.   Plaintiffs are "qualified persons with disabilities" as defined under the ADA.  42 U.S.C. § 12102; 42 U.S.C. § 12131; 28 C.F.R. § 35.104.

140.   Under the ADA's broad language, a "program, service, or activity" includes within its scope "anything a public entity does."  *Yeskey v. Pennsylvania Dep't of Corr.*, 118 F. 3d 168, 171 & n. 5 (3d Cir. 1997), *aff'd* 524 U.S. 206 (1998) (quoting 28 C.F.R.

Pt. 35, App. A, preamble to ADA regulations).  At all times relevant to this action, Defendant has been a public entity within the meaning of Title II of the ADA and has provided programs, services, or activities to the public.  The County's Program, including the assessment of Plaintiffs and other homeless people with disabilities in order to relocate them to appropriate housing solutions, is a service, program, or activity of the County.

141.   Defendant also is "obligated to ensure" that its agents and contractors comply with the ADA's anti-discrimination provisions in carrying out a public program, service, or activity.  *Castle v. Eurofresh, Inc.*, 731 F.3d 901, 909-10 (9th Cir. 2013); *see also* U. S. DEPT OF JUSTICE, THE AMERICANS WITH DISABILITIES ACT TITLE II TECHNICAL ASSISTANCE MANUAL COVERING STATE AND LOCAL GOVERNMENT PROGRAMS AND SERVICES, II–1.3000 (1993) ("[A] state agency must ensure that its contracts are carried out in accordance with Title II[.]").  Under the Program, the County contracted with shelters and motels to provide temporary housing accommodations and was therefore required to ensure that those accommodations comply with the ADA's anti-discrimination provisions.

142.   Title II protects people with disabilities from facially neutral policies that burden people with disabilities more than others and requires that the public entity provide reasonable modifications to avoid the discrimination unless the public entity can demonstrate that such modifications would result in a fundamental alteration of the

program.  28 C.F.R. § 35.130(b)(7); *Crowder v. Kitagawa*, 81 F.3d 1480 (9th Cir.

1996).  A failure to provide such modifications is an independent basis for liability

under the ADA.  28 C.F.R. § 35.130(b)(7)(i); *McGary v. City of Portland*, 386 F.3d

1259, 1266 (9th Cir. 2004).

143.   Reasonable modifications can adjust for the financial limitations that arise from

a disability, not just the immediate manifestations of the impairment that gives rise to

the disability.  *Giebeler v. M & B Associates*, 343 F.3d 1143, 1152 (9th Cir. 2003).

144.   Plaintiffs are eligible for the Program and requested reasonable modifications

that would not fundamentally alter the nature of the service provided.  Defendant has

violated and continues to violate the antidiscrimination requirements of Title II of the

ADA by their policies and practices, as described herein, to allow Plaintiffs and others

like them to access the Program.  In particular, Defendant's refusal to modify their

policies and practices in a way that reasonably accommodates Plaintiffs' disabilities

and affords them an opportunity to access the benefits of the Program, including the

provision of affordable, accessible and disability appropriate housing, is a violation.

Defendant also has violated Title II of the ADA by failing to ensure that its temporary

housing accommodations comply with the ADA's anti-discrimination provisions.

145.   Title II regulations interpreting the ADA prohibit a public entity from utilizing

criteria or methods of administration that have the effect of subjecting qualified

individuals with disabilities to discrimination based on disability.  29 C.F.R. § 35.130(b)(3).

146.   A public entity is also prohibited from imposing eligibility criteria that screen out or tend to screen out individuals with disabilities from fully and equally enjoying any service, program, or activity.  28 C.F.R. § 35.130(b)(8).

147.   It is Defendant's policy and practice to administer the Program without accommodating for people with disabilities, including by employing an assessment that does not appropriately identify and assess disabilities and does not connect people with disabilities to disability appropriate housing.  This failure to accommodate people with disabilities has the effect of discriminating against and imposing disproportionate burdens on people with disabilities based on their disability, screening out such persons from the benefits of the County's Program, and denying them meaningful access to such benefits compared to the amenities enjoyed by and available to people without disabilities.

148.   In carrying out Defendant's policies and practices as described herein, Defendant has utilized criteria or methods of administration that have the effect of subjecting qualified individuals with disabilities to discrimination based on disability. 29 C.F.R. § 35.130(b)(3).

149.   In carrying out Defendant's policies and practices as described herein, Defendant has utilized federal and state funds, and has implemented federally funded

programs, in a manner that discriminates against qualified individuals on the basis of their disabilities.

150. Plaintiffs have standing to sue because they have been personally aggrieved by the County's unlawful conduct as alleged herein. PHTF has standing because its mission has been frustrated and its resources have been diverted to assist homeless individuals with disabilities who have been impacted by the implementation of the Program, and because its injuries are the direct and proximate cause of the County's conduct and can be redressed by the relief sought herein. Further, PHTF seeks to vindicate interests germane to its purpose and neither the claim asserted nor the relief requested requires the participation of its individual members.

151. Based on the foregoing, Plaintiffs are entitled to and demand declaratory and injunctive relief and reasonable attorneys' fees and costs.

152. Based on the foregoing, Plaintiffs, and the homeless individuals PHTF seeks to protect, have suffered damages and will continue to suffer damages as a result of the County's discriminatory practices. These damages include, without limitation, the out-of-pocket costs associated with relocating from homeless encampments and the physical and emotional distress caused by the County's conduct, as alleged herein. These damages are a direct and legal result of Defendant's actions and omissions.

## SECOND CAUSE OF ACTION
### Violation of Americans with Disabilities Act – Intentional Discrimination
### (42 U.S.C. § 12132; 42 U.S. Code § 12133; 29 U.S.C § 794a)

153.   Plaintiffs hereby incorporate each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

154.   Title II of the ADA protects people with disabilities against intentional discrimination by a public entity where the public entity has knowledge that a harm to a federally protected right is substantially likely and fails to act upon that the likelihood.  *Duvall v. County of Kitsap*, 260 F.3d 1124, 1139 (9th Cir. 2001).

155.   Defendant intentionally discriminated against Plaintiffs and other homeless residents because of their disabilities by intentionally excluding them from the program.  Plaintiffs alerted Defendant to the need for accommodations, yet Defendant failed to modify the Program to allow equal access to the Program and deliberately refused to engage in an interactive process with Plaintiffs.

156.   In carrying out Defendant's policies and practices as herein described and denying Plaintiffs' request for reasonable modification in violation of Plaintiffs' rights under the ADA, Defendant has acted knowingly and with deliberate indifference to the harm substantially likely to occur.

157.   In carrying out Defendant's policies and practices as described herein, Defendant has intentionally utilized federal and state funds, and has implemented

federally funded programs, in a manner that discriminates against qualified individuals on the basis of their disabilities.

158.   As a direct and legal result of Defendant's actions and omissions, Plaintiffs have suffered severe emotional distress.

159.   Plaintiffs are entitled to injunctive and declaratory relief, damages, attorneys' fees and costs.

### THIRD CAUSE OF ACTION
### Violation of § 504 of the Rehabilitation Act of 1973
### (29 U.S.C. § 794; 29 U.S.C § 794a)

160.   Plaintiffs hereby incorporate each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

161.   Section 504 of the Rehabilitation Act of 1973 requires that qualified persons with disabilities be provided with meaningful access to federally funded programs.  In order to ensure meaningful access, reasonable modifications may be required unless the recipient of federal funding can demonstrate that such modifications would result in a fundamental alteration in the nature of the program.  29 U.S.C. § 749; 24 C.F.R. §§ 8.3 and 8.4; *Alexander v. Choate*, 469 U.S. 287, 301 (1985).

162.   At all times relevant herein, Defendant has been the recipient of financial assistance from the federal government.  Upon information and belief, the Program is funded in whole or in part by financial assistance from the federal government.

163.   Defendant has used its federal funds in a manner that discriminates against people with disabilities in violation of section 504 of the Rehabilitation Act. Defendant's actions and omissions as herein stated have denied Plaintiffs' rights to reasonable modifications, thereby denying them meaningful access to the Program and to the amenities that the County offers residents without disabilities, thereby subjecting them to discrimination on the basis of disability in violation of section 504 of the Rehabilitation Act.

164.   As a direct and legal result of Defendant's actions and omissions, Plaintiffs have suffered severe emotional distress.

165.   Plaintiffs are entitled to injunctive and declaratory relief, damages and attorneys' fees and costs.

**FOURTH CAUSE OF ACTION**
**Violation of Substantive Due Process: State Created Danger / Reckless Endangerment**
**(42 U.S.C. §§ 1983, 1988; Fourteenth Amendment)**

166.   Plaintiffs hereby incorporate each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

167.   Under the Substantive Due Process Clause of the Fourteenth Amendment, the state deprives a person of a substantive due process right if it affirmatively places the person in a position of danger. *Wood v. Ostrander*, 875 F. 2d 578, 583 (9th Cir. 1989).

168.   Defendant has acted and continues to act affirmatively as described herein to place Plaintiffs in a highly dangerous situation that they would not otherwise face,

threatening Plaintiffs' health and safety, risking serious exacerbation of their disabilities, and putting their lives at risk.  Plaintiffs are informed and believe that the acts of Defendant and its employees and agents were part of a countywide policy, practice, or custom.

169.   Defendant has acted affirmatively by implementing a comprehensive Program to assess homeless individuals, including Plaintiffs, and relocate them without affording them meaningful access to the benefits of the Program, including housing that accommodates their disabilities.  By failing to modify the Program to accommodate people with disabilities, Defendant has exposed Plaintiffs to flashbacks, re-traumatization, heightened mental health symptoms, and psychological damage.  Further, by pushing Plaintiffs to go to temporary shelters without any accommodation for their disabilities, Defendant has subjected Plaintiffs to dangers that put their health and well-being at risk, including aggravation of their mental health conditions and physical disabilities, loss of property that is essential to their survival, and loss of stability and community.

170.   Defendant has acted affirmatively by implementing a policy to terminate Plaintiffs' and other disabled homeless individuals' motel or housing benefits without notice or an opportunity to be heard if the County deems those individuals to have "behavioral issues."  By terminating Plaintiff Ramirez's motel benefits without notice or an opportunity to be heard, without an opportunity to arrange alternative

accommodations, and without allowing Ramirez to access his tent, blankets, or warm clothes, the County exposed Ramirez to extreme emotional distress, hypothermia, and physical illness.

171.   In the absence of Defendant's affirmative actions, Plaintiffs would not face these highly dangerous situations.  Plaintiffs knew or reasonably should have known that their actions would create these threats to Plaintiffs' health and safety. Defendant acted with reckless disregard or deliberate indifference to the dangers they were creating for Plaintiffs because Defendant knew or should have known that Plaintiffs and other homeless individuals experience disabilities, are chronically homeless, and have no other viable options for shelter, in violation of Plaintiffs' substantive due process rights under the Fourteenth Amendment to the U.S. Constitution.  *Wood*, 875 F. 2d at 583.

172.   As a result of Defendant's actions, Plaintiffs' health and safety have been placed in grave danger in violation of the Fourteenth Amendment.  As a direct and legal result of Defendant's actions and omissions, Plaintiffs have suffered severe emotional distress and are entitled to damages.

173.   An actual controversy exists between Plaintiffs and Defendant as to whether Defendant has violated and / or are imminently threatening to violate 42 U.S.C. § 1983.  Plaintiffs have no adequate remedy at law for the violations stated herein and

are therefore entitled to injunctive, declaratory, and other equitable relief.  Plaintiffs are

also entitled to attorneys' fees and costs.

### FIFTH CAUSE OF ACTION
### Violation of Equal Protection
### (42 U.S.C. §§ 1983, 1988; Fourteenth Amendment, U.S. Constitution; Art. 1 § 7, California Constitution)

174.   Plaintiffs hereby incorporate each and every allegation contained in the

foregoing paragraphs as if fully set forth herein.

175.   Equal protection requires that the same means and methods be applied

impartially to all constituents, so that the laws operate equally and uniformly on all

persons in similar circumstances, meaning that persons who are similarly situated with

respect to a law must be treated alike.

176.   As a result of Defendant's unequal treatment of disabled homeless individuals,

Plaintiffs are intentionally and arbitrarily denied protections of their rights and have

suffered from unequal treatment under the law solely on the basis of their being

disabled and homeless.

177.   Based on the foregoing, Plaintiffs have suffered severe emotional distress and

are entitled to declaratory and injunctive relief, damages, attorneys' fees and costs.

### SIXTH CAUSE OF ACTION
### Violation of Bane Act
### (California Civil Code § 52.1)

178.   Plaintiffs hereby incorporate each and every allegation contained in the

foregoing paragraphs as if fully set forth herein.

179.   California Civil Code § 52.1, also known as the "Bane Act," provides a cause of action to individuals whose exercise or enjoyment of rights secured by the United States and / or California Constitutions and other laws has been interfered with, or attempted to be interfered with, by another's threat, intimidation, or coercion.

180.   By their conduct and actions as set forth herein, Defendant has interfered with, has attempted to interfere with, and continues to interfere with, by threat, intimidation, and / or coercion by the Orange County Sheriff, and citations, arrests, and punishments or the threat thereof, Plaintiffs' exercise of their rights to meaningfully access the County's Program.  Federal and state statutory protections guarantee those rights to individuals with disabilities.

181.   There was and is no lawful justification for Defendant to threaten, intimidate, or coerce any of the Plaintiffs or to attempt to use threats, intimidation, or coercion, as described herein, to interfere with Plaintiffs' exercise of their rights.  Defendant's actions were and are taken willfully and with malice and oppression in order to deter and / or prevent Plaintiffs from exercising their rights.

182.   As a direct and legal result of Defendant's actions and omissions, Plaintiffs have suffered severe emotional distress and are entitled to declaratory and injunctive relief, attorney's fees and costs.

## SEVENTH CAUSE OF ACTION
### Violation of Procedural Due Process
### (42 U.S.C. §§ 1983, 1988; Fourteenth Amendment)

183.   Plaintiffs hereby incorporate each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

184.   The Fourteenth Amendment to the U.S. Constitution prevents the government from depriving a person of their property without due process of law, including the rights to adequate notice and a meaningful opportunity to be heard.

185.   By removing Plaintiff Ramirez from his home on the Riverbed and relocating him to a motel with a guaranteed 30-day minimum stay after which the County promised to provide him with additional "appropriate housing," the County created a legitimate expectation that Plaintiff Ramirez would continue to receive the benefit of County-provided shelter.  Through Defendant's relocation of Plaintiff Ramirez to a motel and subsequent promise of appropriate housing, Defendant created a constitutionally protected property interest with respect to Plaintiff Ramirez's access to shelter.

186.   Defendant or its agents, acting under color of law, evicted Plaintiff Ramirez from the motel he was placed in before 30 days had expired and without adequate notice or an opportunity to be heard.  Defendant told Plaintiff Ramirez of his impending eviction the same day it was scheduled to occur, and provided no mechanism for him to object to his eviction, such as a hearing.

187.   Plaintiff Ramirez's interest at stake was critically important: his access to shelter and food on a cold night.  Because Defendant had previously instructed Plaintiff Ramirez to leave his tent, warm clothes, and blankets at the Riverbed, and because he had no time to secure other shelter, Plaintiff Ramirez was forced to sleep on the sidewalk on a night when temperatures dropped to the mid-40s.  This type of vital property interest – shelter – is one that requires adequate notice and a pre-deprivation opportunity to be heard in order to comply with the Due Process Clause of the Fourteenth Amendment.

188.   Defendant acted with deliberate indifference to Plaintiff Ramirez's constitutional right to procedural due process when Defendant evicted him from his motel stay prior to the expiration of 30 days.

189.   Plaintiffs are informed and believe that it is the policy, custom and practice of Defendant to fail to provide adequate notice or an opportunity to be heard before evicting mentally disabled homeless individuals from their motel stays prior to expiration of their 30 day stay.

190.   Defendant's conduct directly and proximately caused Plaintiff Ramirez to be deprived of his constitutionally protected right to due process and caused him to suffer physical, mental, and emotional harm.

191.   Based on the foregoing, Plaintiffs suffered severe emotional distress and are entitled to declaratory and injunctive relief, damages, attorneys' fees, and costs.

## EIGHTH CAUSE OF ACTION
### Interference with Right to Petition the Government
### (42 U.S.C. §§ 1983, 1988; First and Fourteenth Amendments)

192.   Plaintiffs hereby incorporate each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

193.   Under the First Amendment, Plaintiffs possessed a clearly established right to petition the government for the redress of grievances and for services.

194.   Defendant interfered with this right when it acted under color of law, through its agents, including motel employees with whom the County entered into a contract, to remove telephones from motel rooms where Plaintiffs were placed by Defendant.

195.   Defendant knew or should have known that Plaintiffs, indigent homeless individuals with disabilities and a lack of resources, do not own or possess cellular devices or personal computers with access to the internet.  By intentionally removing telephones from Plaintiffs' motel rooms, the Plaintiffs were deprived of access to any methods of contacting the County, other government officials, or even emergency medical services.

196.   A substantial or motivating factor in Defendant's decision to take actions against Plaintiffs was Plaintiffs' exercise of their constitutional right to petition the government for grievances.

197.   As a direct and proximate result of Defendant's violations of Plaintiffs' constitutional rights, Plaintiffs suffered substantial mental and emotionally injuries as

well as general damages.  Based on the foregoing, Plaintiffs suffered severe emotional distress and are entitled to declaratory and injunctive relief, damages, attorneys' fees, and costs.

## NINTH CAUSE OF ACTION
### Interference with Right to Seek and Associate with Counsel
### (42 U.S.C. §§ 1983, 1988; First, Fifth, and Fourteenth Amendments)

198.   Plaintiffs hereby incorporate each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

199.   Plaintiffs have a First Amendment right to associate with counsel and a substantive due process right to seek and obtain counsel under the Fifth and Fourteenth Amendments of the United States Constitution.  Plaintiffs exercised their constitutional rights under the First, Fifth and Fourteenth Amendments when they consulted with legal counsel regarding their rights under California and federal law and when they requested time to consult with counsel before agreeing to accept services that could exacerbate their disabilities and before participating in a Program that discriminates against people with disabilities.

200.   Upon information and belief, County agents had policymaking authority, or were acting under the direction of a person with policymaking authority, when they pressured Plaintiffs to accept County services without any information about the services provided or whether they would accommodate their disabilities, without the opportunity to consult with counsel.  Plaintiffs are informed and believe that the acts of

the Defendant and its employees and agents were part of a countywide policy, practice, or custom.  Upon information and belief, County agents had full knowledge that Plaintiffs were people with disabilities who had made reasonable modification requests, including that they be permitted time to consult with counsel.

201.   As a direct and proximate result of Defendant's violations of Plaintiffs' constitutional rights, Plaintiffs have suffered substantial damages, including emotional distress due to being forced to participate in the Program that discriminates against people with disabilities and being relocated to motels that exacerbate their disabilities. Based on the foregoing, Plaintiffs suffered severe emotional distress and are entitled to declaratory and injunctive relief, damages, attorneys' fees, and costs.

**TENTH CAUSE OF ACTION**
**Right to Be Secure From Unreasonable Seizures**
**(42 U.S.C. §§ 1983, 1988; Fourth Amendment, U.S. Constitution;**
**Art. 1, §13, California Constitution)**

202.   Plaintiffs hereby incorporate each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

203.   Defendant and its employees and agents violated Plaintiffs' Fourth Amendment rights to be free from unreasonable seizure of their property by confiscating and then destroying Plaintiffs' property without a warrant.

204.   These unlawful actions were carried out with the specific intent to deprive Plaintiffs of their constitutional rights to be secure in their property.

205.   Plaintiffs are informed and believe that the Defendant and its employees and agents acted intentionally in failing to protect and preserve Plaintiffs' property. Further, at minimum, Defendant was deliberately indifferent to the likely consequence that the property would be seized and destroyed unlawfully in view of the fact that the right at issue was well-established at the time.  Defendant's actions were part of a countywide policy, practice, or custom that systematically deprived homeless Plaintiffs as well as other disabled homeless individuals living on the Riverbed of their personal property by, as a general practice, instructing them to leave behind their personal belongings and subsequently destroying those belongings.

206.   As a direct and proximate consequence of these unlawful acts, Plaintiffs have suffered and continue to suffer loss of their personal property and are entitled to compensatory damages for their property and personal injury.  Based on the foregoing, Plaintiffs are entitled to declaratory and injunctive relief, damages, attorneys' fees, and costs.

**ELEVENTH CAUSE OF ACTION**
**Right To Due Process Of Law – Seizure of Property**
**(42 U.S.C. §§ 1983, 1988; Fifth And Fourteenth Amendments, U.S. Constitution;**
**Art. I, § 7, California Constitution)**

207.   Plaintiffs hereby incorporate each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

208.   Defendant, its employees and agents, owed Plaintiffs a duty under the due process clauses of the Fifth and Fourteenth Amendments to the U.S. Constitution and Article I, § 7 of the California Constitution to protect the personal property of the Plaintiffs.  This duty applied to preserving the Plaintiffs' personal property, which Defendants took possession of when Plaintiffs, at Defendant's instruction, left their belongings at the Riverbed and were relocated to motels.

209.   Despite this well-defined duty, Defendant provided Plaintiffs with inadequate notice that their property was at risk of being seized and / or destroyed and did not act to preserve the property or provide adequate means of reclaiming it in a timely manner even though the right to such notice and preservation of property was well-established at the time.

210.   Plaintiffs are informed and believe that the acts of the Defendant, its employees and agents, were intentional in failing to protect and preserve Plaintiffs' property and that, at minimum, were deliberately indifferent to the likelihood that the property would be seized and destroyed without due process based on the past occurrences of these same constitutional and statutory violations of the law.

211.   Defendant has seized and destroyed the personal property of the Plaintiffs without due process, lawful justification, or just compensation.  Defendant's actions were part of a countywide policy, practice, or custom that systematically deprived homeless Plaintiffs as well as other disabled homeless individuals living on the

Riverbed of their personal property by, as a general practice, instructing them to leave behind their personal belongings and subsequently destroying those belongings.

212.   As a direct and proximate consequence of the acts of Defendant's agents and employees, Plaintiffs have suffered and continue to suffer loss of their personal property and are entitled to compensatory damages for their property and other injury to their person.  Based on the foregoing, Plaintiffs are entitled to declaratory and injunctive relief, damages, attorneys' fees, and costs.

## TWELFTH CAUSE OF ACTION
### Violation of the Fair Housing Act
### (42 U.S.C. § 3604)

213.   Plaintiffs hereby incorporate each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

214.   The Fair Housing Act ("FHA") declares it unlawful to make a dwelling unavailable or deny, or to discriminate against any person in the terms, conditions, or privileges of the rental of a dwelling or in the provision of services or facilities in connection with such dwelling, because of the handicap of a person residing in or intending to reside in that dwelling after it is made available.  42 U.S.C. § 3604(f). Discrimination also includes "a refusal to make reasonable accommodations in rules, policies, practices, or services, when such accommodations may be necessary to afford such person equal opportunity to use and enjoy a dwelling."  42 U.S.C. § 3604(f)(3)(B).  Prohibited activities include "[e]nacting or implementing . . . policies[]

78

or procedures that restrict or deny housing opportunities or otherwise make unavailable or deny dwellings to persons because of their handicap."  24 C.F.R. §100.70(d)(5).

215.   The County's shelters and motels qualify as "dwellings" within the meaning of the FHA because they are used as residences by one or more individuals.  42 U.S.C. § 3602(b).  Plaintiffs have nowhere else to go and have relied on the emergency shelters and motels as their only residence.  *Woods v. Foster*, 884 F. Supp. 1169, 1173 (N.D. Ill. 1995).

216.   Plaintiffs and others similarly situated, including those individuals PHTF seeks to protect, have a handicap within the meaning of the FHA because of physical and / or mental impairments that substantially limit one or more of their major life activities. 42 U.S.C. § 3602(h).

217.   The County has discriminated against these individuals because of their handicaps by depriving them, or threatening to deprive them, of the ability to stay at the motels or the emergency shelters, in essence making these dwellings "unavailable," and by failing to provide reasonable modifications.  Plaintiffs are informed and believe, and based thereon allege, that the County had a policy of moving individuals with disabilities from the Riverbed and requiring them to leave their most essential living items, and then placed them in motels that had fixtures like telephones, refrigerators, televisions and shower curtains removed.  By depriving these individuals

of telephones, the County prevented them from calling for assistance or emergency services, thereby discriminating against them by reason of their disabilities.

218.   Plaintiffs are informed and believe, and based thereon allege, that the County intentionally discriminated against homeless individuals because of their handicaps. The County agreed to the removal of fixtures in rooms occupied by indigent disabled individuals with no other access to resources, resulting in long periods of hunger, sleep deprivation, and inability to call for assistance.  Further, the County's ongoing denials of reasonable modifications to make shelters available for individuals with mental and physical disabilities is discriminatory.  In the alternative, Plaintiffs are informed and believe, and based thereon allege, that the County's Program and policies as alleged herein, and its provisions of services or facilities at the motels and emergency shelters, have a disproportionate impact on handicapped individuals, including Plaintiffs, and the homeless individuals with disabilities whom PHTF seeks to protect.

219.   By the actions set forth above, Defendant has: (a) made housing unavailable on the basis of disability in violation of 42 U.S.C. § 3604(f)(1); (b) imposed different terms, conditions, or privileges in housing on the basis of disability in violation of 42 U.S.C. § 3604(f)(2); and (c) failed or refused to make reasonable accommodations in rules, policies, practices, or services, when such accommodations may have been necessary to afford persons with disabilities an equal opportunity to use and enjoy a dwelling in violation of 42 U.S.C. § 3604(f)(3)(B).

220.   Plaintiffs are aggrieved persons as defined by the Fair Housing Act because they have been injured by Defendant's discriminatory housing actions.  42 U.S.C. § 3602(i).  As a direct and legal result of Defendant's actions and omissions, Plaintiffs have suffered severe emotional distress.  Based on the foregoing, Plaintiffs are entitled to injunctive and declaratory relief, damages, attorneys' fees and costs.

## THIRTEENTH CAUSE OF ACTION
### Violation of the Duty to Affirmatively Further Fair Housing
### (42 U.S.C. §§ 1983, 3608(e)(5))

221.   Plaintiffs hereby incorporate each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

222.   The FHA requires federal agencies, as well as the housing-related programs and activities that they fund, to operate "in a manner affirmatively to further fair housing." 42 U.S.C. § 3608(e)(5).  Regulations implementing Section 3608 require local jurisdictions receiving federal funds to submit a certification that they will affirmatively further fair housing, conduct an analysis to identify impediments to fair housing choice, take appropriate actions to overcome the impediments identified, and maintain records reflecting the analysis and actions taken.  24 C.F.R. §§ 91.225(a)(1), 570.601.

223.   As a recipient of federal funds – including Community Development Block Grant (CDBG), Emergency Shelter Grant (ESG), HOME Investment Partnerships

Program (HOME), and Public Housing Authorities (PHAs) – these obligations extend to the County.

224.   The County breached those obligations through its policy, custom, or practice, by enacting and enforcing the Program without making available its services to individuals with disabilities and failing to accommodate those individuals, which runs contrary to the notion of affirmatively furthering fair housing.  The County is therefore liable to Plaintiffs under 42 U.S.C. § 1983, which provides a private cause of action to any person who is deprived of rights, privileges, or immunities under the color of law.

225.   The County's breach of those obligations has damaged and will continue to cause damages to Plaintiffs and individuals PHTF aims to protect.

226.   Plaintiffs are informed and believe, and based thereon allege, that the County's discriminatory acts against Plaintiffs and individuals that PHTF aims to protect were malicious, intentional, and recklessly and callously indifferent to Plaintiffs' protected rights.

227.   Based on the foregoing, Plaintiffs are entitled to injunctive and declaratory relief, damages, attorneys' fees and costs.

## FOURTEENTH CAUSE OF ACTION
### Violation of FEHA—Disability and Source of Income Discrimination
### (Cal. Gov't Code §§ 127920, 12927, 12955)

228.   Plaintiffs hereby incorporate each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

229.   FEHA declares it unlawful to discriminate by making unavailable or denying access to a dwelling, based on the handicap of a person residing in or intending to reside in that dwelling after it is made available.  Cal. Gov. Code § 12955(k).  It is also unlawful to aid, abet, incite, compel, or coerce such acts or practices.  *Id.* §12955(g).  Unlawful discrimination includes making housing opportunities unavailable; denying or withholding housing accommodations; or providing inferior terms, conditions, privileges, facilities, or services in connection with housing accommodations.  *Id.* §§12955(g),(k), 12927(c)(1).  "Courts often look to cases construing the FHA, the Rehabilitation Act of 1973, and the American with Disabilities Act of 1990 when interpreting FEHA."  *Auburn Woods I Homeowners Ass'n v. Fair Employment and Housing Com'n*, 121 Cal. App. 4th 1578, 1590 (2004).

230.   The County's emergency shelters and motels qualify as "dwellings" within the meaning of FEHA because they are used as residences by one or more individuals.  Plaintiffs have nowhere else to go and have relied on the emergency shelters and motels as their only available housing option.  *Woods*, 884 F. Supp. at 1173.

231.   Plaintiffs and individuals that PHTF seeks to protect have an actual or perceived disability with the meaning of FEHA because their respective physical and / or mental impairments substantially limit one or more of their major life activities.  *See id.* §§ 12955.3, 12926(j),(m).

232.   The County has discriminated against these individuals because of their

handicaps by depriving them, or threatening to deprive them, of the ability to stay at

motels or the emergency shelters, in essence making their dwellings "unavailable," and

by failing to provide reasonable modifications.  Plaintiffs are informed and believe,

and based thereon allege, that the County intentionally discriminated against Plaintiffs

and other homeless individuals with disabilities because of their disabilities.  In the

alternative, Plaintiffs are informed and believe, and based thereon allege, that the

County's policies and services will have a disproportionate impact on disabled

individuals.  Moreover, the County failed to modify said policies and services as

requested by Plaintiffs.

233.   Based on the foregoing, Plaintiffs are entitled to and demand declaratory and

injunctive relief, reasonable attorneys' fees and costs.

### FIFTEENTH CAUSE OF ACTION
### Breach of Fiduciary Duty of Care
### (California Common Law)

234.   Defendant knowingly undertook to act on behalf of and for the benefit of

Plaintiffs as homeless residents of Orange County by applying for and receiving

federal funds from the Department of Housing and Urban Development to combat

homelessness, by appointing Susan Price as Orange County's Director of Care

Coordination.  Susan Price was and is charged with the responsibility of orchestrating

efforts within County agencies and departments on behalf of a growing homeless

population, to better address their needs, and by contracting with agencies like HCA to conduct assessments and connect resources to the homeless.[40]  The County acknowledges that it "is a local governmental agency *responsible for* developing, managing and delivering a range of critical public services to more than three million county residents."[41]

235.   Because of the public-service functions maintained by the County on behalf of homeless individuals, and the trust and confidence placed in the County based on their expertise by the homeless residents, including Plaintiffs, Defendants owed a fiduciary duty to the Plaintiffs and other homeless residents in Orange County to act in their best interest.

236.   Defendant breached its fiduciary duty to act in Plaintiffs' best interest as homeless residents of the County by committing gross waste and mismanagement of funds reserved for homeless services and programs.  Defendant, for no apparent reason, failed to use $700 million in available, unspent funds at the County's disposal reserved for homelessness services, including $155,345,450 specifically for affordable housing development and $5,386,222 specifically for mental health residential care

---

[40] Theresa Walker, *Will She Be the Champion in Orange County's Homelessness Battle?*, OC Register (2016), *available at* https://www.ocregister.com/2016/06/20/will-she-be-the-champion-in-orange-countys-homelessness-battle/.

[41] County of Orange, *At Your Service: Delivering for Orange County A Guide to Agencies and Departments*, *available at* http://viewer.epageview.com/Viewer.aspx?docid=0bd922f3-585f-44c8-be24-a56b00a7af84.

and housing.[42]  In fact, out of an estimated total $786,481,342 in available County resources for homeless services, Defendant inexplicably only used $94,394,224, a meager 8.33% of the available funds, leaving 91.67% funds untouched.

237.   Defendant's breach of its fiduciary duty to act in Plaintiffs' best interest directly resulted in injury to Plaintiffs and similarly situated homeless residents of Orange County by leaving them abandoned in the Riverbed and forced to live without appropriate housing or resources, perpetuating a cycle of homelessness and deterioration of mental health.

238.   Based on the foregoing, Plaintiffs are entitled to declaratory, injunctive, and equitable relief, reasonable attorneys' fees and costs.

### PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs pray as follows:

239.   For a declaratory judgment that Defendant's Program and the eviction of Plaintiffs and other homeless individuals with disabilities from the Riverbed discriminates on the basis of disability in violation of the ADA, 42 U.S.C. § 12132, and the Rehabilitation Act, 29 U.S.C. § 794;

240.   For a declaratory judgment that Defendant's policies, practices and conduct as alleged herein violate Plaintiffs' rights under the United States and California constitutions and the laws of the United States and the State of California;

---

[42] *Supra* n. 6.

241.   For a temporary restraining order, preliminary and permanent injunction, enjoining and restraining Defendant from engaging in the policies, practices and conduct complained of herein, including an order directing Defendant to:

   a.   Modify the Program to enable Plaintiffs and other people with disabilities to meaningfully participate in the Program and to access the benefits of the Program, including disability appropriate housing such as permanent supportive housing;

   b.   Implement procedures to enable people with disabilities to make reasonable modification requests with regard to the Program pursuant to the ADA;

   c.   Refrain from moving Plaintiffs and other homeless residents with disabilities into temporary shelters; and

   d.   Refrain from utilizing state and federal funds in a manner that discriminates against people with disabilities.

242.   For damages to Plaintiffs in an amount to be determined according to proof based on their federal claims only;

243.   For an award to Plaintiffs of reasonable attorneys' fees;

244.   For an award to Plaintiffs of costs of suit; and

245.   For any such other and further relief that the Court deems just and proper.

Dated:     March 23, 2018          By:  /s/ Michele D. Johnson

**LATHAM & WATKINS LLP**
Michele D. Johnson
Andrew Gray
Geelan A. Fahimy
*Attorneys for Plaintiffs*

**LEGAL AID SOCIETY OF ORANGE
COUNTY**
Lili V. Graham
Sarah J. Gregory
Michelle Kim Kotval
Crystal Sims
*Attorneys for Plaintiffs*